## LANDTECT CORPORATION

v.

## STATE MUTUAL LIFE ASSURANCE COMPANY OF AMERICA.

### Nos. 78–2240, 78–2241.

United States Court of Appeals, Third Circuit.

Argued March 22, 1979.

Decided Aug. 16, 1979.

---

Joseph Chicco (argued), William T. Hangley, Goodman & Ewing, Philadelphia, Pa., for appellant.

Steven A. Arbittier (argued), Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for appellee.

Before GIBBONS and HUNTER, Circuit Judges, and MEANOR,* District Judge.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

1. This action arises out of a contract between Landtect Corporation and State Mutual Life Assurance Corporation of America for the development of an industrial park, to be known as Pureland, in Gloucester County, New Jersey. The contract was to be in effect for a period of 5½ years, but was twice extended by State Mutual for one year periods after the original period had elapsed. In January 1977, with the Pureland Project still incomplete, State Mutual refused to extend the contract further. While not challenging State Mutual's right to terminate the contract, Landtect sued State Mutual to recover money allegedly owed to it under the contract.[1] In Count II of its complaint, Landtect sought 45% of the "net profits" earned by the Pureland Project through August 4, 1977, the date the contract expired. In Count III, Landtect claimed that it was entitled to

---

* Honorable H. Curtis Meanor, United States District Judge for the District of New Jersey, sitting by designation.

1. Federal jurisdiction was based on diversity, 28 U.S.C. § 1332.

equitable relief necessary to preserve and protect its interest in, and the "net profits" stemming from, the continued development of Pureland after August 4, 1977.[2]

2. State Mutual thereafter moved for summary judgment on both Counts II and III, and Landtect moved for judgment on the pleadings on Count III. Finding the contract unambiguous, the district court granted summary judgment in favor of State Mutual on Count II and in favor of Landtect on Count III. Both parties appealed. We find that there are disputed issues of material fact with respect to both Count II and Count III. We therefore reverse the district court's order granting summary judgment to State Mutual on Count II and to Landtect on Count III, and remand for a trial on the merits.

## I

### A. *Count II of the Complaint*

3. Landtect conceived the Pureland Project in early 1969 but lacked sufficient capital to acquire and develop all the land itself. Through an intermediary, it contacted State Mutual, which agreed to finance the entire project in return for a share of the profits. Landtect and State Mutual contemplated that once the land had been acquired and developed, parcels would be sold to various industrial purchasers. Unfortunately, the parties found the Project to be much more difficult to market than they had anticipated, and were unable to sell all of the land. Thus, as of August 4, 1977, State Mutual had a total cash investment in Pureland of $14,882,364, while receipts from land values totalled only $10,098,170.[3]

4. After State Mutual terminated the contract, Landtect sought an accounting of the Project's "net profits" through August

4, 1977 and payment of its share of those "net profits." State Mutual contended that it had no obligation to make payment to Landtect because, in its reading of the contract, no payment was required until the receipts from the land sales exceeded State Mutual's outlays plus an amount equal to 12% annual interest on those outlays—an event which both parties concede has never taken place. Landtect disputed State Mutual's view of the contract and brought this suit.

5. The applicable provisions of the contract are paragraphs 9, 11, and 14, and Exhibit 4 to the contract. Paragraph 9 provides in pertinent part:

> 9. As each sale of land is consummated *the gross proceeds* thereof shall be applied and distributed as follows:
>
> .     .     .     .     .
>
> (b) The Company [State Mutual] shall be repaid its total direct investment in the Land, it being understood that "direct investment" shall not include any internal expenses or overhead of the Company, and the like.
>
> (c) The Company shall be paid 12% per annum on its disbursements from the date thereof until recapture.
>
> (d) The balance, if any, shall be paid to the Company pending the year end accounting hereinafter provided for.

State Mutual reads this provision as supporting its understanding of the contract—that no money is due Landtect until State Mutual has recaptured an amount equal to the sum of its disbursements plus annual interest of 12%. Landtect concedes that paragraph 9 controls the distribution of receipts during the life of the Contract. It

---

2. In Count I of the complaint, Landtect sought an amount equal to 61.36% of the net profits of Pureland through August 4, 1977. Landtect does not appeal from the district court's order granting summary judgment to State Mutual on this count.

3. In addition, State Mutual was entitled by paragraph 9 of the Contract to 12% annual interest on its total investment. Interest as of August 4, 1977 was $1,689,743. Thus, State Mutual's investment in Pureland, plus interest, came to $16,572,107, which exceeded revenues by $6,473,937.

asserts, however, that once State Mutual "terminate[s]" the Contract or "fail[s] to extend it," paragraph 14, not paragraph 9, governs. Paragraph 14 states in relevant part:

14. . . . . This Agreement shall continue in force and effect for a period of 5½ years from the Commencement Date, as defined above, or for such longer period of time as the Company may elect. The Company shall have the right to terminate this Agreement for cause, provided that at least 60 days' prior notice of termination is given to Landtect. Notwithstanding the foregoing, *in the event of the Company's* prior termination of this Agreement or its *failure to extend it after the 5½ year term, Landtect shall be entitled to receive a portion of the net profits of the project determined as follows:*

45% of the *net profits* multiplied by a fraction, the numerator of which shall be the number of complete months from the Commencement Date of this Agreement to the date of termination of this Agreement, and the denominator of which shall be the number of complete months from the Commencement Date of the completion of the project or 66 months whichever is less. Said portion of the *net profits* shall be paid to Landtect upon completion of the project or at the expiration of 66 months from the Commencement date of this Agreement, whichever occurs sooner. (Emphasis added)

6. Landtect views this paragraph as *immediately* entitling it to 45% of the "net profits" of the Project, notwithstanding paragraph 9. State Mutual disputes Landtect's claim that paragraph 14 applies, asserting that the precondition to the operation of the paragraph—a "failure to extend" the Contract—did not occur. Even if that precondition did take place, State Mutual contends that "net profits" are to be determined by the cash flow method of

accounting. In other words, State Mutual believes that "net profits" and "positive cash flow" are identical, and that because there was no positive cash flow, *see* ¶ 4 *supra,* there was not "net profits" to be distributed. For support of this position, State Mutual cites paragraph 11, which states:

11. In determining *net proceeds* standard accounting procedures shall be followed, it being understood that no income or similar taxes paid or payable by either the Company or Landtect shall be deducted from any sum received from sale of the Land in computing net proceeds. The Projection Schedule attached hereto as Exhibit 4 shall serve as a guide in determining the net proceeds of the project. Exhibit 4 represents the presently projected cash flow and estimated profit from development of the Land. . . .[4]

7. Landtect denies that paragraph 11 dictates that "net profits" be determined according to cash flow principles. Instead, Landtect asserts that "net profits" is not interpreted in the Contract, so that the phrase must be defined in accordance with standard accounting procedures, which Landtect claims are governed by the "accrual" method. In Landtect's understanding of accrual accounting, all expenses with regard to a particular parcel of land are recognized, not in the year that the expenses occur, as is the case with the cash flow method, but in the year in which the parcel of land is *sold,* and revenue from the sale is recognized. Thus, all revenues and expenses arising out of the purchase, development, and sale of a piece of land are "matched" in the same year. In support of this interpretation of net profits, Landtect refers to numerous documents outside of the Contract which, it believes, make clear that State Mutual and its accountants computed "net profits" consistent with accrual accounting techniques. Under its definition of "net profits," Landtect believes that it is entitled to $2,258,018.

---

4. Exhibit 4 is reprinted in its entirety in the appendix to this opinion.

## B. *Count III of the Complaint*

8. Regardless of how "net profits" are calculated, Landtect asserts in Count III that it is entitled to 45% of any "net profits" of the Project earned after August 4, 1977. Landtect advances two arguments in support of this position. First, Landtect relies on paragraph 13 of the Contract, which entitles Landtect to receive 45% of "[t]he net profits *of the project.*" Landtect contends that the phrase "of the project" refers to the entire Pureland Project. Second, Landtect claims that its relationship with State Mutual constituted a joint venture under New Jersey law, and that as a joint venturer, it is entitled to its share of the net profits of the Project throughout the life of the Project. State Mutual alleges in response that Landtect was merely its agent, and that Landtect's right to a share of the profits continued only so long as the agency relationship lasted, i. e., until the contract was terminated. Of primary importance to State Mutual's position is paragraph 8, which states that "Landtect is hereby designated and appointed as the Company's sole and exclusive agent for the development of the land."

9. In an oral opinion, the district court announced that it did not find "any ambiguity" in the contract. In ruling in favor of State Mutual on Count II, the court determined that "State Mutual did extend the agreement after the initial term," so that the contract provision granting Landtect an immediate share of "net profits" did not by its terms apply. In addition, the court ruled that "[t]he profits of the project were to be determined in the manner set forth in Exhibit 4 to the agreement," so that Landtect was not entitled to receive any net profits until "[a]fter State Mutual had recovered its total direct investment." The district court, in reaching its decision, considered relevant only one document outside of the contract itself. That document was an affidavit by Paul K. Vaillette of State Mutual, which stated that State Mutual had never recaptured its direct investment in Pureland plus 12% interest. With regard to Count III, the court granted Landtect an accounting and the right to its share of "net profits" realized after August 4, 1977, because "the contract calls for participation by Landtect even after the termination of the date of the agreement."

## II

10. In *Goodman v. Mead Johnson & Co.,* 534 F.2d 566 (3d Cir. 1976), this Court defined the scope of appellate review of orders granting motions for summary judgment. We stated:

> Rule 56 (Fed.R.Civ.P.] allows the trial court to grant summary judgment if it determines from its examination of the allegations in the pleadings and any other evidential source available that *no genuine issue as to a material fact remains for trial,* and that the moving party is entitled to judgment as a matter of law. . . *On review the appellate court is required to apply the same test* the district court should have utilized initially. Inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion. The nonmovant's allegations must be taken as true and, when these assertions conflict with those of the movant, the former must receive the benefit of the doubt.

*Id.* at 573 (emphasis added). In short, if the parties disagree about material facts and if the non-moving party would be entitled to relief if the jury believed its version of the facts, then summary judgment is inappropriate.

11. The meaning of a contract such as this one normally is a question of fact. In *Heyman v. Commerce and Industry Insurance Co.,* 524 F.2d 1317 (2d Cir. 1975), the Second Circuit held that "discerning contractual intent" is a question of fact unless the provisions of a contract are "wholly unambiguous." *Id.* at 1320. We addressed when a contract can be considered ambigu-

ous in *Gerhart v. Henry Disston & Sons,* 290 F.2d 778 (3d Cir. 1961). There, we stated:

> An ambiguous contract is one capable of being understood in more senses than one; an agreement obscure in meaning through indefiniteness of expression, or having a double meaning. . . . Before it can be said that no ambiguity exists, it must be concluded that the questioned words or language are capable of [only] one interpretation.

*Id.* at 784 (citations omitted); *see* A. Corbin, 3 Corbin on Contracts § 542, at 108–10 (1960); S. Williston, 4 Williston on Contracts § 609, at 402–04 (3d ed. 1961).

12. Thus, in order for us to affirm the district court with respect to either Count II or III, we must determine that the Contract is so clear that it can be read only one way. If the non-moving party presents us with a reasonable reading of the contract which varies from that adopted by the district court, then a question of fact as to the meaning of the contract exists which can only be resolved at trial.

## A. *Count II*

■ 13. With respect to Count II, Landtect's reading of the contract depends on two premises. First, Landtect assumes that there was a "failure to extend [the contract] after the 5½ year term," so that paragraph 14, and not paragraph 9, governs the distribution of "net profits." Second, Landtect contends that the phrase "net profits" in paragraph 14 is to be determined in accordance with accrual accounting procedures, instead of the "cash-flow" method.

14. In the phrase "failure to extend . . . after the 5½ year term," we are presented with a classic example of ambiguity. State Mutual contends that there was no "failure to extend" because it did extend the contract for one year periods after both 5½ and 6½ years. Thus, State Mutual

takes the position that once the contract is extended beyond 5½ years, there can be no subsequent "failure to extend." Landtect, on the other hand, claims that "a failure to extend" occurs whenever, after 5½ years, State Mutual declines to extend the contract and allows it to expire, regardless of whether there has been a previous extension.

15. Landtect's interpretation of the "failure to extend" language is, as a matter of English construction, entirely plausible; moreover, the rationale which it uses to justify this construction is persuasive. Landtect envisions paragraph 14 as giving it the right to prompt payment of its share of "net profits" if ever it ceased to be Pureland's developer before completion of the Project. State Mutual concedes that if, at the end of 5½ years it had failed to extend the contract, Landtect would have been entitled to immediate payments of all "net profits" earned.[5] Yet, under State Mutual's reading of the "failure to extend" language, State Mutual could have escaped the impact of paragraph 14, thus defeating Landtect's right to immediate payment, merely by unilaterally extending the contract for one day. We are not called upon in this appeal to determine which of these conflicting interpretations of "failure to extend" is correct. We conclude, however, that Landtect's approach is sufficiently credible that resolution of the parties' meaning of "failure to extend" becomes a question of fact. Thus, the district court erred in ruling that as a matter of law, paragraph 14 was inapplicable.

■ 16. Therefore, since paragraph 14 governs the distribution of "net profits" for summary judgment purposes, our next task is to decide whether that phrase, as it appears in paragraph 14, can be construed in accordance with accrual, rather than cash flow, accounting techniques. Landtect as-

---

**5.** State Mutual's concession is based on the last sentence of paragraph 14, which states that Landtect's share of the net profits, in the event of a failure to extend, "shall be paid . . . upon completion of the project or at the expiration of 66 months from the Commencement date of this Agreement, whichever occurs sooner."

serts that it was clearly the intent of the parties to use the accrual method. In support of this argument, Landtect refers to no less than 38 documents [6] authored by State Mutual officials and independent auditors.[7] Among those documents are an internal memorandum dated January 25, 1974 from Paul Martino, State Mutual's Real Estate Accounting Manager, stating that "profits" on the sale of certain Pureland land to Shell Oil totalled $3,903,358.27, and that Landtect's share of those profits was $889,-923.88; [8] a worksheet prepared by Martino in (according to Landtect) October 1974, computing Landtect's share of the "total net profits" of Pureland at $1,945,348.32, less advances; [9] and a 1974 financial statement by State Mutual's independent auditor, Price Waterhouse & Co., listing Landtect's share of "net income" as $1,059,000, "under the formula for distribution of net income." [10] These three documents, as well as others offered to the district court,[11] appear to recognize the existence of net profit or net income arising from the Project. They therefore cut against State Mutual's theory that the term "net profits" is equivalent to positive cash flow, because it is undisputed that cash flow was negative from the inception of the Project.

17. In defense of its interpretation of "net profits," State Mutual first claims that the documents relied on by Landtect define "net profits" according to the accrual meth-od for income tax purposes only, and not in connection with the actual or potential distribution of Project revenues. A jury may well appreciate the distinction which State Mutual seeks to draw; however, our obligation in this appeal by Landtect from an order granting summary judgment is to accept Landtect's contrary construction of those documents as long as that construction is plausible. We hold that it is.

18. Second, State Mutual argues that paragraph 11 of the Contract mandates that "net profits" be determined in accordance with cash flow principles. We agree with Landtect's characterization of this paragraph as "the work product of a draftsman out of control", and conclude that the paragraph is ambiguous. There are three relevant sentences in paragraph 11. The first states: "In determining net *proceeds* standard accounting procedures shall be followed. . . ." (emphasis added). The second provides: "Exhibit 4 shall serve as a guide in determining the *net proceeds* of the project" (emphasis added). The third reads "Exhibit 4 represents the presently projected cash flow *and* estimated profit from development of the Land"(emphasis added).

19. Exhibit 4, in part, presents an estimate of yearly cash flow. Thus, both the second sentence (if "net proceeds" and "net

---

6. *See* Supplemental Exhibit Nos. L–A–1 through L–A–38.

7. The district court made no mention of these documents in its opinion. Thus, it is unclear whether the district court refused to consider the documents, or whether it considered them but found them to be irrelevant. We have no doubt that these documents are both relevant and admissible in the context of a motion for summary judgment. *See Capitol Bus Co. v. Blue Bird Coach Lines, Inc.,* 478 F.2d 556, 560 (3d Cir. 1973); *Ludwig Honold Mfg. Co. v. Fletcher,* 405 F.2d 1123, 1130, n.31 (3d Cir. 1969); 3 A. Corbin, § 542 at 108–10; 4 S. Williston, § 609 at 402–04.

8. Supplemental Exhibit L–A–8.

9. Supplemental Exhibit L–A–19. Landtect asserts that this figure represents total net profits as of December 31, 1973. We are unable to determine the applicable date from the face of the Exhibit.

10. Supplemental Exhibit L–A–37.

11. *See, e. g.,* Supplemental Exhibit L–A–15 (Letter to Landtect from Andrew Wilson, Real Estate Analyst for State Mutual, listing balance of "undistributed profits" as $919,148.27); Supplemental Exhibit L–A–2 (internal memorandum from Ralph H. Saunders, State Mutual's Mortgage Officer defining the "profit" of a proposed sale of land to Shell Oil Co. as the selling price of the land minus sales commission and the cost of the land to State Mutual).

profits" are equivalent) and the third sentence (if "estimated profits from development of the Land" and "net profits" are identical) would appear, at first glance, to support the inference that "net profits" represents positive cash flow.

20. One difficulty with this approach, however, is that paragraph 11 also requires that net proceeds/net profits be determined according to standard accounting procedures. Landtect asserts that under standard accounting procedures, net profits are not determined by resort to the cash flow method.[12] Thus, in Landtect's view, if Exhibit 4 is a "guide" in determining net proceeds/net profits, it is not the part of Exhibit 4 which projects cash flow. Instead, according to Landtect, the relevant section of the Exhibit is that which defines which items are attributable to income and which to expenses.

21. In addition, Landtect emphasizes that the preamble to the Contract defines the word "Land" as meaning *all* the land of Pureland.[13] Thus, in Landtect's interpretation, the phrase "estimated profit from development of the Land" refers to the final estimated profit of Pureland once all the parcels of land are sold. Given the assumption that every parcel of land is sold, the figure for final profits would be the same whether calculated on as cash flow or on an accrual basis. Landtect therefore contends that the third sentence in paragraph 11 does no more than inform the reader where to look for the predicted bottom line of the Project, and offers no support for the theory that "net profits" and cash flow are *always* equivalent.

22. As we have previously mentioned, we do not choose sides at this juncture of the litigation. Rather, we hold only that after considering the constructions of the contract advanced by both parties, we conclude that the meaning of the contract is ambiguous, and that a trial on the merits is warranted. We therefore reverse the order of the district court with regard to Count II.

**B.  *Count III***

■ 23. Landtect bases its claim of a right to "net profits" of the Project realized after August 4, 1977 on paragraph 13 of the contract, and on the alleged existence of an implied joint venture. Paragraph 13 states:

> The *net profits of the project* shall be shared by the Company [State Mutual] and Landtect in the following proportion:
>
> | | |
> |---|---|
> | The Company | 55% |
> | Landtect | 45% |

Landtect contends that the phrase "of the project" means "of the entire Pureland project." Thus, Landtect reads paragraph 13 as granting it, without qualification, a share of the profits of the Project from start to finish. If paragraph 13 were the only relevant provision, we might be inclined to agree with the district court that the contract unambiguously granted Landtect the right to receive profits after August 4, 1977. Paragraph 8, however, appears to support State Mutual's contrary reading. That paragraph provides:

> Landtect is hereby designated and appointed as the Company's sole and exclusive agent for the development of the land, commencing as of the [Commencement Date].
>
> (a) The agency shall continue for the term of this agreement, it being understood that the appointment and agency is coupled with an interest and shall be

---

**12.** H. Sellin, Attorney's Practical Guide to Accounting, at S–15 (1965); *see Smith v. Peninsula House, Inc.*, 65 N.J.Super. 341, 167 A.2d 807 (App.Div.1961).

**13.** The preamble states in relevant part: "[State Mutual] is interested in acquiring for investment and development parcels of land situate in . . . Gloucester County, New Jersey, . . . comprising approximately 2,600 acres, but a minimum of approximately 2,127 acres . . . as more particularly identified on plan marked Exhibit 1 . . . . (such parcels being hereinafter sometimes called the 'Land')."

irrevocable during such time, except as provided in paragraph 14 hereof.

(b) No fee shall be paid to Landtect for its services pursuant to that agency, but the costs incurred by it or expenditures made by it in connection therewith . . . shall be paid or reimbursed to Landtect by the Company as provided in paragraph 7(c) hereof.

■ 24. A plausible reading of paragraph 8 is that Landtect was State Mutual's agent, rather than its partner or joint venturer, and that the agency was to continue only for the term of the agreement. If Landtect were in fact merely State Mutual's agent, it would take a strained interpretation of the contract to provide Landtect with the continuing profits of Pureland even if those profits were derived from the work of another agent, or of State Mutual itself. Assuming the existence of an agency relationship, the more likely interpretation of the agreement is that Landtect was granted a share of the profits only as compensation for its own services, not for the work of others. We hold, therefore, that the contract is ambiguous with respect to Count III, and that summary judgment is inappropriate.[14]

## CONCLUSION

25. The district court order regarding both Count II and III of Landtect's complaint will be reversed and remanded for trial on the merits.

---

**14.** State Mutual counterclaimed to recover the advances it had made to Landtect for overhead and salaries. The district court granted summary judgment to Landtect on the counterclaim and State Mutual appealed. We hold that whether State Mutual is entitled to repayment by Landtect is, under the circumstances, a question for the trier of fact. We therefore reverse the district court order on the counterclaim. However, we read the contract as providing clearly that State Mutual's recovery on the counterclaim will be limited to a set-off against any profits presently payable or to be paid to Landtect under the agreement. In the event that no profits are paid, State Mutual shall have no affirmative recovery against Landtect.

PURELAND PROJECT: Showing imputed interest @ 12% (Latimer & Buck, Inc. projection)

EXHIBIT "J"

| Yearly Funds Flow (In 000) | First ½ Yr. | Yr.1 | Yr.2 | Yr.3 | Yr.4 | Yr.5 | TOTALS |
|---|---|---|---|---|---|---|---|
| Opening Balance | $-0- | $ 286 | $ 0 | $ 320 | $ 0 | $ 0 | ($ 606) |
| Fixed Costs: | | | | | | | |
| Overhead & salaries | 75 | 125 | 125 | 125 | 125 | 125 | 700 |
| marketing | 50 | 100 | 100 | 100 | 100 | 100 | 550 |
| costs to date | 214 | 0 | 0 | 0 | 0 | 0 | 214 |
| Development Costs | 0 | 354 | 0 | 0 | 60 | 836 | 1,250 |
| Land Costs: | | | | | | | |
| equity, commission & closing expense | 239 | 1,816 | 3,080 | 1,941 | 944 | 538 | 8,558 |
| options | 47 | 108 | 60 | 0 | 0 | 0 | 215 |
| real estate taxes | 0 | 33 | 212 | 157 | 121 | 28 | 556 |
| Interest on Mortgages (1) | 0 | 64 | 274 | 172 | 84 | 48 | 642 |
| Contingency | 22 | 63 | 81 | 44 | 56 | 56 | 322 |
| Sub Total | $647 | $2,954 | $3,932 | $2,859 | $1,490 | $1,731 | $13,007 |
| Interest imputed @ 12% | 39 | 354 | 472 | 343 | 179 | 208 | 1,595 |
| Total Disbursement | $686 | $3,308 | $4,404 | $3,202 | $1,669 | $1,939 | $14,602 |
| Sales of Land | 413 | 3,784 | 4,160 | 4,560 | 8,250 | 6,806 | 27,973 |
| Cost of Sales (7½%) | 31 | 284 | 312 | 342 | 618 | 510 | 2,097 |
| Net Sales | 382 | 3,500 | 3,848 | 4,218 | 7,632 | 6,296 | 25,876 |
| Interest Prorated (6%) | 18 | 177 | 236 | 171 | 89 | 104 | 795 |
| Total Receipts | 400 | 3,677 | 4,084 | 4,389 | 7,721 | 6,400 | 26,671 |
| Cash Flow-Yearly | ($286) | $ 369 | ($ 320) | $1,187 | $6,052 | $4,461 | $12,069 |
| Plus prepaid overhead & salaries | 0 | 200 | 0 | 250 | 125 | 125 | 700 |
| Total Profit | $ | $ 569 | $ | $1,437 | $6,177 | $4,586 | $12,769 |
| Division to State Mutual Partner: 52.25% of total profit | | $ 298 | | $ 750 | $3,227 | $2,396 | $ 6,671 |
| Servicing to L & B, Inc. 2.75% of total profit | | 15 | | 40 | 170 | 126 | 351 |
| Division to Partner-Developer 45% of total profit | 256 | | 647 | 2780 | 2064 | | |
| Less prepaid overhead & salaries | 200 | | 250 | 125 | 125 | | |
| | $ 56 | | $ 397 | $2,655 | $1,939 | $5,047 | |

(1) 8% used; maximum rate approximately 7.25%

**LAND SALES***

| Years: | 1st ½ - 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| HI 48 ac @ $ 8,600 = | $413 | | | | |
| HI 400 ac @ $ 9,460 = | | $3,784 | | | |
| HI 400 ac @ $10,400 = | | | $4,160 | | |
| HI 400 ac @ $11,400 = | | | | $4,560 | |
| HI 400 ac @ $12,500 = | | | | | $5,000 |
| LI 130 ac @ $25,000 = | | | | | 3,250 |
| | | | | | $ 8,250 |
| HI 214 ac @ $13,700 = | | | | | $2,931 |
| LI 135 ac @ $28,700 = | | | | | 3,875 |
| | | | | | $6,806 |

2,127 acres

* HI: Heavy Industrial @ $8,600/acre plus 10% increase per year

LI: Light Industrial @ $25,000/acre plus 15% increase per year