**CEMAR, INC., t/a Rising Sun Motors, Plaintiff,**

v.

**NISSAN MOTOR CORPORATION IN U.S.A., Defendant.**

**NISSAN MOTOR CORPORATION IN U.S.A., Counter–Plaintiff,**

v.

**CEMAR, INC., t/a Rising Sun Motors,**

and

**William T. Murray, Counter–Defendants.**

**Civ. A. 87–165–CMW.**

United States District Court, D. Delaware.

May 17, 1989.

726

Kenneth W. Lewis of Daley & Lewis, Newark, Del.; David F. Albright, Franklin T. Caudill, and Paul J. Cohen of Semmes, Bowen & Semmes, Baltimore, Md., of counsel, for plaintiff.

Robert K. Payson of Potter, Anderson & Corroon, Wilmington, Del., Reed E. Hundt, Eric A. Stern, and Carol Ann Siciliano of Latham & Watkins, Washington, D.C., of counsel, for defendant.

OPINION

CALEB M. WRIGHT, Senior District Judge.

Plaintiff, an automobile dealer, brought this suit against defendant, Nissan Motor Corporation, U.S.A. ("Nissan"), for breach of contract, negligent misrepresentation, and violations of the Automobile Dealers' Day in Court Act (DDICA), 15 U.S.C. §§ 1221, *et seq.*, and of four provisions of the Maryland Transportation Code, §§ 15–207, 208, 209, and 211. Plaintiff originally filed this action in the U.S. District Court for the District of Maryland in 1985. The case was transferred to the District of Delaware in 1987. In 1988, this Court granted defendant's motion to dismiss Counts II–V of the complaint, which alleged federal antitrust and RICO violations. *See Cemar, Inc., v. Nissan Motor Corp.*, 678 F.Supp. 1091 (D.Del.1988). Plaintiff withdrew Count X, which alleged fraud. The case is now before the Court on defendant's motion for summary judgment on the remaining seven counts of the complaint.

## I. THE FACTS.[1]

Plaintiff, Cemar, Inc., trading as Rising Sun Motors ("Cemar"), is owned by William Murray ("Murray") and his wife.[2] In 1973, Murray, as president of Cemar, signed a Datsun Dealer Sales & Service Agreement with Nissan. This agreement entitled Cemar to operate a Datsun/Nissan dealership in Rising Sun, Maryland (the "Rising Sun dealership"). In 1975, Murray and Nissan renewed the agreement. In 1979, Nissan granted Cemar a perpetual Nissan franchise. (the "perpetual agreement"). In essence, the perpetual agreement gave Cemar the right to continue indefinitely as a Nissan dealer without periodic renewal. The perpetual agreement contained two significant restrictions: Cemar could neither assign the franchise nor

---

1. The Court has adopted plaintiff's (the nonmoving party's) version of those facts that are in dispute.

2. The parties disagree over whether Stephen Pitcairn, who is not a party to this action, is also a part owner of plaintiff. The Court has found it unnecessary to resolve that issue in deciding this motion.

change the location of the dealership without Nissan's approval.

The Rising Sun dealership was moderately successful in its first few years of operation, but it was never profitable enough for Murray to draw a salary. Almost from the beginning, Murray decided that the dealership could be more profitable in another location. During the next few years Murray made a number of requests to Nissan to transfer the dealership to another location. He particularly wanted to move to Elkton, Maryland, but he also considered a location in Perryville, Maryland. Nissan denied each request for a transfer.

The Rising Sun dealership began to show annual losses. Murray then entered into discussions with Tillman B. Cox and Aubrey J. Cox (the "Coxes") about selling them the dealership. Nothing came of those negotiations, and the dealership continued to suffer losses. Then, sometime in the spring of 1982, Murray learned that one of the main roads leading past the dealership would be closed indefinitely for construction, greatly limiting the access of the automobile-buying public to the dealership. Moving the dealership became imperative.

In May, 1982, Nissan representatives Alvin Walton, John Borgen, and Arthur Warren[3] met with Murray to discuss the future of the Rising Sun dealership. At the meeting, it was decided that Murray would move the dealership to Perryville, Maryland. Murray immediately began to plan for the move. Although he knew that any move had to be approved by Nissan's management, Murray believed from the discussions with Walton, Borgen, and Warren that this approval would be *pro forma*.

In June, however, Walton told Murray that, before the move would be approved, Murray would have to secure a five-year lease on an appropriate property for the dealership in Perryville, with options to renew and an option to buy. Accordingly, later that month, Murray signed a five-year lease, with options, for the facility that would later house the Perryville dealership.

In July, Walton told Murray that Nissan would impose another condition before approving the Perryville dealership. Walton said that Murray would have to write a letter to Nissan management requesting that, upon approval of the Perryville dealership, his perpetual agreement concerning the Rising Sun dealership be terminated. Murray has testified that, until then, he assumed the move would entail a transfer of the perpetual franchise to the new dealership in Perryville.[4] Murray expressed his surprise and disappointment to Walton on hearing of this additional condition. Nevertheless, he complied, and wrote the letter as Walton instructed.

Later that month, Walton gave Murray a written agreement, not yet executed by Nissan, which, when executed, would authorize plaintiff to operate the Perryville dealership. (the "Perryville agreement"). Unlike the Rising Sun agreement, the Perryville agreement was not "perpetual," but for a term of years. The space on the agreement that provided for the length of the term had been left blank. Walton told Murray that Cemar would be granted a two-year term, and Walton even filled in the blank with the word "two" in pencil. Murray signed the agreement and sent it to Nissan headquarters.

In August, Nissan approved the Perryville agreement. But, to Murray's surprise, Nissan granted him a term of only one year. Murray did not attempt to withdraw from the deal, however, and later that month, closed the Rising Sun dealership and opened the new dealership in Perryville.

Sometime during the summer of 1982, Murray spoke to Walton about the number and mix of vehicles that Murray would need at the Perryville dealership. Murray sought Walton's assurance that the Perryville dealership would receive a supplemen-

3. Walton was District Sales Manager; Borgen was Regional Sales Manager; and Warren was Sales Director. Walton was Murray's main contact at Nissan.

4. There is no evidence, however, that anyone from Nissan ever told Murray, or otherwise led him to believe, that he would be allowed to transfer the perpetual franchise.

tal allocation of vehicles in addition to its regular monthly allocations under Nissan's standard Equitable Distribution System ("EDS"). According to Murray, Walton said: "I'll get you cars when you make your move." *Murray Deposition Cemar Appendix* at 31, 33.

From the beginning, the Perryville dealership was unsuccessful. It incurred losses, and Murray was forced to seek additional bank loans. According to Murray, Nissan also refused to give him a fair allocation of vehicles for the new dealership. Murray discussed selling the dealership with a few potential buyers, including Leonard Logue, David Sturgill, Arnold and Mark Smerlson, and the Coxes. In March, 1983, Murray reached an agreement with the Coxes to sell the dealership for $225,-000, subject to Nissan's approval. Nissan approved the Coxes as dealers, and on May 6, 1983, the sale was completed and the Coxes took over the dealership.

## II. DEALERS' DAY IN COURT ACT (Count I).

Cemar claims that Nissan's conduct, both in connection with the termination of the Rising Sun dealership, and in connection with the sale of the Perryville dealership to the Coxes, violated § 1222 of the Automobile Dealers' Day in Court Act (DDICA), 15 U.S.C. §§ 1221 *et seq.* The DDICA provides that an automobile dealer may recover damages caused by "the failure of [an] automobile manufacturer ... to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, cancelling, or not renewing the franchise with said dealer." *Id.* § 1222.

The statute defines acting in "good faith" as acting so as to guarantee the other party's "freedom from coercion, intimidation, or threats of coercion or intimidation...." *Id.* § 1221(e). To show a violation of § 1222, therefore, a dealer plaintiff must show that a manufacturer actually employed coercion or intimidation in connection with the franchise. *Cabriolet Porsche Audi v. American Honda Motor Co.*, 773 F.2d 1193, 1210 (11th Cir.1985),

*cert. denied,* 475 U.S. 1122, 106 S.Ct. 1641, 90 L.Ed.2d 186 (1986).

### A. Termination of the Rising Sun Dealership.

██ Cemar argues that Nissan employed coercion in connection with the termination of the Rising Sun dealership because Walton "coerced" Murray into writing the July letter in which Murray agreed to cancel his Rising Sun dealership in exchange for Nissan's approval of the move to Perryville.

It is difficult to understand exactly where Cemar claims that the coercion lies. Despite the assertions of Cemar's counsel that Murray "did not write [the] letter voluntarily[,]" *Cemar Mem.* at 18, it is clear from the depositions that counsel cites that, although Walton dictated the form that the letter was to take, and told Murray what information to include (in order to ensure that the letter would conform to Nissan's requirements for changing dealerships), Murray concedes that he wrote the letter of his own accord.

Cemar's theory of coercion appears to be based on Murray's testimony that Nissan did not disclose all of the conditions that it would impose on Murray before approving the Perryville agreement until after Murray had entered into a five-year lease on the facility for the Perryville dealership and in general made too much progress toward the planned move to turn back. Cemar contends that Nissan put Murray in a position where he had no choice but to comply with Nissan's conditions. *Cemar Mem.* at 19.

It is clear from Murray's deposition testimony that he felt "forced" to agree to Nissan's conditions only because he wanted to get Nissan to agree to the Perryville dealership. Cemar has presented no evidence that Nissan coerced or intimidated Murray into leasing the Perryville property, or terminating the Rising Sun franchise, or agreeing to a one-year agreement in Perryville. Viewing the evidence in the light most favorable to Cemar, Murray was simply in such bad shape economically, and so eager to make the move to Perryville, that he was in no position to drive a harder

bargain with Nissan. In other words, Murray was "coerced," if at all, not by Nissan, but by his own economic circumstances and goals. *See Murray Dep., Cemar App.* at 104; *id.* at 44 (in response to a question about why Murray did not simply refuse to terminate the Rising Sun dealership, or refuse to make the Perryville investment on a two-year deal, Murray said: "We are talking about financial suicide.... I didn't think I was going to fail in Perryville."). Cemar has presented no evidence that Nissan coerced Murray into terminating his Rising Sun dealership or into accepting a one-year franchise for the Perryville dealership.

### B. The Sale of the Perryville Dealership.

■ Cemar claims that Nissan violated § 1222 of the DDICA by "coercing" Murray into selling the Perryville dealership to the Coxes at an artificially low price, by preventing other potential buyers from entering into serious negotiations, and by providing the Coxes with confidential information about Cemar's financial status. The Court finds this claim to be without merit. Cemar does not explain how Nissan's alleged conduct relates to "performing or complying with any of the terms or provisions of the franchise[,]" or to "terminating, cancelling, or not renewing the franchise with said dealer." In addition, as explained in Section V of this Opinion, infra, the Court finds that Cemar has failed to raise a genuine issue of material fact relating to its claim that Nissan forced it to sell the Perryville dealership to the Coxes.

For the foregoing reasons, the Court will grant Nissan's summary judgment motion as to Count I.

### III. UNLAWFUL COERCION OF A DEALER (Count VI).

■ Cemar also claims that Nissan violated Md.Trans.Cd.Ann. § 15–207 by allegedly coercing Murray into terminating the Rising Sun dealership and entering into the Perryville agreement. The statute provides in pertinent part:

*Coercion of dealer prohibited.*

(a) "Coerce" defined.—In this section:

(1) "Coerce" means to compel or attempt to compel by threat of harm, breach of contract, or other adverse consequences; and

(2) "Coerce" does not mean to argue, urge, recommend or persuade.

(b) In general.—A manufacturer, distributor, or factory branch, whether directly or through an agent employee, or representative, may not coerce any dealer to make any agreement with the manufacturer, distributor, or factory branch.

Md.Trans.Cd.Ann. § 15–207. Cemar alleges the same facts in support of this claim that it alleged in Count I in support of its claim that Nissan violated the Dealers' Day in Court Act. The same analysis applies here. For the reasons discussed in part II of this Opinion, the Court finds that plaintiff has failed to raise a genuine issue as to coercion. Defendant's motion for summary judgment will therefore be granted as to Count VI.

### IV. WRONGFUL TERMINATION UNDER THE MARYLAND TRANSPORTATION CODE (Count VIII).

■ Plaintiff claims that Nissan terminated both its perpetual franchise in Rising Sun, and its one-year term franchise in Perryville, in violation of Md.Trans.Code Ann. § 15–209. The statute provides in pertinent part:

(a) Manufacturers.—A manufacturer may not terminate, cancel, or fail to renew the franchise of a dealer, notwithstanding any term or provision of the franchise, unless:

(1) The dealer has failed to comply with the reasonable requirements of the franchise; and

(2) Except as otherwise provided by subsection (d) of this section, the manufacturer:

(i) Gives the dealer at least 90 days prior written notice of the termination, cancellation, or nonrenewal and of the specific grounds for the action; and

(ii) Provides the Administration with a copy of that notice.

*Id.* § 15–209(a).

It is undisputed that Murray, and not Nissan, actually terminated both dealer-

ships. Cemar argues, however, that when a manufacturer coerces a dealer to terminate its franchise, the manufacturer should be deemed to have terminated the franchise in violation of § 15–209(a). Cemar claims that Nissan in effect terminated both dealerships by putting Murray in a position, each time, where he was forced to terminate them himself.

The parties have not identified, nor has the Court found, any cases interpreting the statute. However, the Court need not decide whether a showing of coercion would make out a violation of § 15–209(a). As discussed in Part II of this opinion, Cemar has not presented evidence raising a genuine issue as to coercion in connection with the termination of the Rising Sun dealership. For the following reasons, the Court also concludes that there is similarly no evidence that Nissan coerced Cemar into selling the Perryville dealership to the Coxes.

Cemar argues that Nissan coerced Cemar into selling the Perryville dealership to the Coxes by refusing to "fulfill its obligations to Cemar." *Cemar Mem.* at 54. However, the only evidence that Cemar offers to support this allegation is a graph showing various levels of inventory at the dealership, allocations from Nissan, and the number of vehicles sold each month from January, 1982, to March, 1983. *See Borgen Declaration Exhibit 3, Nissan Appendix* at 90. According to Cemar, this graph "bear[s] out that Nissan was not fulfilling [its] obligations." *Cemar Mem.* at 54. But Cemar has offered no explanation—either in its brief or at oral argument—of how the figures on the graph lend any support either to the claim that Nissan had certain "obligations" to Cemar, or to the claim that Nissan did not fulfill those alleged "obligations."

Thus, the Court finds that Cemar has offered no evidence to support its allegation that Murray was coerced into terminating the Perryville dealership. Because Cemar has offered no evidence of any acts in violation of Md.Trans.Code Ann. § 15–209, the Court will grant defendant's motion as to Count VIII.

## V. WRONGFUL PREVENTION OF TRANSFER AND WITHHOLDING OF CONSENT (Count IX).

Cemar alleges that Nissan wrongfully prevented Cemar from transferring the Perryville dealership to any potential purchasers other than the Coxes, and wrongfully withheld consent for such a transfer, in violation of Md.Trans.Cd.Ann. § 15–211, which provides in pertinent part:

(a) Manufacturers.—A manufacturer, whether directly or through an agent, employee, or representative, may not prevent, by contract or otherwise, any owner, partner, or stockholder or any dealership from transferring any ownership interest in the dealership to any other person.

\* \* \* \* \* \*

(d) Transfer of franchise.—A dealer or owner, partner, or stockholder of a dealership may not sell, assign, or otherwise transfer a franchise or any right under a franchise without the consent of the manufacturer.

(e) Manufacturer withholding consent.— However, the manufacturer may not unreasonably withhold consent to the transfer of a franchise under subsection (d) of this section.

Md.Trans.Cd.Ann. § 15–211. Nissan denies that it either prevented, or withheld consent for, any transfer of the Perryville franchise.

### A. *Wrongful Prevention of Transfer.*

■ Cemar claims that Nissan prevented Murray from transferring the Perryville franchise to anyone other than the Coxes by disclosing confidential information about Cemar's financial position to the Coxes to aid the Coxes in their negotiations with Murray. In support of this claim, Cemar offers evidence that Nissan divulged to the Coxes the amount of rent that Cemar had paid for the Perryville dealership facilities and the amount of money that Cemar owed to the Wilmington Trust Company. *Cemar Mem.* at 29.

Specifically, Murray testified that, during the period in which he was negotiating

with the Coxes, he had revealed to Nissan representative Alvin Walton that he owed $150,000 to the bank. At Murray's next meeting with the Coxes, they offered to buy the Perryville dealership for exactly that amount. Another time, Murray revealed to Nissan that he was paying rent of $2250 per month on the Perryville facilities. "All of a sudden," Murray says, the Coxes offered to sublet the facilities for "less than" $2500. *Murray Dep., Cemar App.* at 131–32.

Murray's testimony does not make out a violation of § 15–211(a). The statute prohibits a manufacturer from preventing the owner of a dealership from transferring his ownership interest to another person. *Id.* § 15–211(a). The Court fails to see how Nissan's alleged actions would have prevented Murray from selling the Perryville dealership to anyone he chose. If he did not like the Coxes' offers, Murray could have cut off his dealings with the Coxes and concentrated on other prospects. Cemar has offered no evidence that Nissan took any action to prevent transfer of the Perryville dealership.

### B. Withholding Consent.

Cemar also alleges that Nissan unreasonably withheld consent to the transfer of Cemar's franchise to parties other than the Coxes. In support of this claim, Cemar offers the statements of Murray and of Stephen Guyer, an employee at the Rising Sun and Perryville dealerships.

Murray's testimony is that Leonard Logue and David Sturgill broke off negotiations for the sale of the Perryville dealership, giving as their reasons that Nissan had informed them that they would not be approved as dealers. Murray also says that Arnold and Mark Smerlson broke off negotiations, giving as their reason that they thought that Walton was biased in

favor of the Coxes. *Cemar Mem.* at 30–31. The statements allegedly made by Logue, Sturgill, and the Smerlsons are clearly inadmissible hearsay, and therefore, the Court cannot consider them in deciding this motion for summary judgment.[5]

■ Guyer's testimony is that Tillman Cox told him that Nissan intended to disapprove anyone other than the Coxes as purchasers of the Perryville franchise. *Cemar Mem.* at 58; *Guyer Affidavit ¶ 14, Cemar App.* at 394. Cox's alleged statement also appears to be hearsay. Cemar contends, however, that it is admissible under Fed.R.Evid. 801(d)(2), which provides: "A statement is not hearsay if [t]he statement is offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."

It is a preliminary matter for the court to determine if the statement is admissible. *United States v. Ammar,* 714 F.2d 238, 247 n. 5 (3d Cir.), *cert. denied, sub nom. Stillman v. U.S.,* 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983). Plaintiff must satisfy the requirements of Rule 801(d)(2) by a preponderance of the evidence. 714 F.2d at 246. Cemar points to the following evidence in support of its assertion that there was a conspiracy between Tillman Cox and Nissan to withhold consent to the transfer of the Perryville dealership: (1) Tillman Cox's apparent access to confidential information about Cemar's financial position; and (2) Tillman Cox's statements to Stephen Guyer that Nissan would not approve anyone else to buy the Perryville dealership. After considering Cemar's argument and weighing the evidence, the Court finds that Cemar has not met its burden of showing that there was a such a conspiracy.[6] Therefore, Cox's alleged statement does not satisfy Rule 801(d)(2), and is inadmissible hearsay.

The Court notes in addition that the record contains the direct testimony of Leonard Logue. Logue testified that he never made such a statement to Murray, that Nissan never told him that he would not qualify as a dealer, and that it was Murray who broke off negotiations for sale of the Perryville dealership. *Logue Declaration, Nissan App.* at 92–93.

The Court notes that there is no reason to believe that Nissan would or could "enter into a conspiracy" with Tillman Cox to do something that was within Nissan's sole power to do unilaterally, i.e., to withhold approval for potential purchasers.

■ Because Cemar offers no admissible evidence in support of its claim that Nissan unreasonably withheld its approval of potential purchasers besides the Coxes, Cemar has failed to raise a genuine issue of material fact as to that claim.

As a matter of law, Cemar has failed to show a violation of Md.Trans.Cd.Ann. § 15–211. Defendant's motion for summary judgment will therefore be granted as to Count IX.

## VI. NEGLIGENT MISREPRESENTATION (Count XI).

Cemar alleges that Nissan negligently misrepresented the terms of the Perryville agreement. Specifically, Cemar alleges that Nissan's representative, Alvin Walton, negligently and falsely represented that Cemar would get a two-year franchise for the Perryville dealership, instead of the one-year term that Nissan actually granted, and that Cemar would get a better allocation of vehicles for Perryville than it in fact received.

Maryland law applies to the resolution of this common law claim. Under Maryland law, a claim for negligent misrepresentation requires proof of the following elements:

(1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement; (2) the defendant intends that his statement will be acted upon by the plaintiff; (3) the defendant has knowledge that the plaintiff will probably rely on the statement which, if erroneous, will cause loss or injury; (4) the plaintiff, justifiably, takes action in reliance on the statement; and (5) the plaintiff suffers damage proximately caused by the defendant's negligence.

*Martens Chevrolet v. Seney*, 292 Md. 328, 337, 439 A.2d 534, 539 (1982). To prevail on its motion for summary judgment, Nissan must show that Cemar has failed to raise a genuine issue as to at least one of those elements.

### A. *The Term Length of the Franchise.*

■ Cemar has presented evidence that Walton "assured" Murray that he would be granted a two-year franchise. Murray claims that he took Walton's assurance to mean that a decision had already been made by Nissan to grant a two-year term. Cemar has also presented evidence that, when Walton told Murray that he would have to terminate his perpetual franchise in order to move to Perryville, Murray expressed surprise and disappointment.

Viewing the facts in the light most favorable to Cemar, a jury could reasonably infer that Walton, as Nissan's representative, negligently asserted a false statement to Cemar, to whom Nissan owed a duty of care, and that Walton intended Murray to act on the statement.

However, there is no evidence in the record that Murray actually relied on Walton's assurance in entering into the Perryville agreement. In order to show reliance, it is not enough to show that Murray would have preferred a two-year term. Nor is it enough to show that Murray thought he would get a two-year term when he signed the agreement. Cemar must show that Murray would not have agreed to terminate the Rising Sun dealership, or would not have signed the Perryville dealership agreement, if he had known that the Perryville franchise would be for one year instead of two.

Cemar has made no such claim, nor is there any evidence of it in the record. On the contrary, the undisputed evidence is that Murray was desperate to move from Rising Sun to Perryville. In addition, Murray has testified that he did not back out of the move to Perryville after he learned of Nissan's conditions "[b]ecause I didn't think I was going to fail." *Murray Dep., Cemar App.* at 44.

Cemar argues that Murray relied on Walton's statements in the sense that he "had no choice but to rely upon [Walton's] representations" when he was "coerced into moving ... [to] Perryville." *Cemar Mem.* at 60–61. However, reliance is not the same thing as coercion. Reliance naturally implies some choice between two or more possible decisions (in this case, either signing the Perryville agreement or staying in Rising Sun). Coercion, on the other hand,

implies that the person who is coerced has no choice. If Murray was coerced into signing the agreement, Walton's representations about the nature of the agreement did not affect whether Murray signed it or not. Furthermore, as discussed in Part II of this Opinion, Cemar has failed to present any evidence that Nissan coerced Murray into signing the agreement.

Because the Court finds that Cemar has not sustained its burden of raising a genuine issue of material fact as to reliance, it is unnecessary to consider whether Murray suffered any injury as a result of his signing the one-year Perryville agreement. In passing, however, it may be noted that there is no such evidence in the record. On the contrary, it is undisputed that the Perryville dealership lost money from the beginning, and that Cemar sold to the Coxes before the end of the first year term.

### B. The Allocation of Vehicles to Perryville.

█ Cemar claims: (1) that Walton assured Murray that he would receive a "substantial increase" in his vehicle allocation, "in a mixture conducive to the Perryville market" when he moved Perryville; (2) that Murray relied on that statement in deciding to move to Perryville; (3) that Nissan did not produce the promised increase in vehicles; and (4) that Murray suffered damages as a proximate result of his reliance on Walton's promise. *Cemar Mem.* at 22, 60.

The only evidence in the record of such an assurance is Murray's testimony that Walton told him: "I will get you cars when you make your move." *Murray Dep., Cemar App.* at 33; *see also id.* at 31. Even if it is reasonable to infer from this statement that Walton was promising a "substantial increase" in the number of vehicles, Cemar has again failed to offer any evidence that Murray relied on Walton's statement in making his decision to sign the Perryville agreement. Cemar has also failed to offer any evidence of damage suffered as a proximate result of Walton's assurances.

7. The dealership agreements incorporated by

For the foregoing reasons, The Court will grant Nissan's motion for summary judgment on Count XI.

### VII. BREACH OF CONTRACT (Count XII).

Cemar makes two breach of contract claims. First, Cemar claims that Nissan terminated the Rising Sun dealership in violation of the perpetual agreement. Second, Cemar claims that Nissan breached the Perryville dealership agreement by failing to provide the required allocation of vehicles. Again, Maryland law applies.

### A. Termination of the Rising Sun Perpetual Agreement.

█ Cemar claims that, in requiring Murray to terminate that agreement and enter into a term agreement in order to move to Perryville, Nissan breached § 2(C) of the Datsun Dealer Sales and Service Agreement, Standard Provisions (the "Standard Provisions"). *Nissan App.* at 65.[7]

The Standard Provisions provide in pertinent part:

§ 2. *Dealership Location and Dealership Facilities.*

B. *Dealership Facilities Addendum.* Dealer and [Nissan] will execute, effective as of the date of this agreement, a Dealership Facilities Addendum which will include a description of the Dealership Location and Dealership Facilities and the current Guides therefor.

\* \* \* \* \* \*

C. *Changes and Additions.* Dealer shall not move or relocate or modify or change the usage of the Dealership Location or any of the Dealership Facilities, nor shall Dealer ... directly or indirectly establish or operate any other locations or facilities for the sale or servicing of Datsun Products or for the conduct of any other of the dealership operations contemplated by this Agreement without the prior written consent of [Nissan]. *Any changes in the Dealership Location or Dealership Facilities that may*

reference the Standard Provisions.

*be agreed to by [Nissan] and Dealer shall be reflected in a new Dealership Facilities Addendum executed by [Nissan] and Dealer.*

Standard Provisions, § 2 (emphasis added).

According to Cemar, the last sentence in § 2(C) should be interpreted to mean that the transfer of Cemar's dealership from Rising Sun to Perryville could only be accomplished by the execution of a "new Dealership Facilities Addendum", and therefore that it could not be accomplished by the termination of Cemar's perpetual franchise and the execution of a new term agreement. *Cemar Mem.* at 19–20.

Nissan argues that it required Cemar to terminate the Rising Sun perpetual franchise as a condition of moving to Perryville, and that the provision cited by Cemar does not restrict the conditions that Nissan could impose upon a dealer who sought to relocate.

This claim raises a question of contract interpretation. Such questions can be resolved by summary judgment only if the contract is so clear that it can be read only one way. *Landtect Corp. v. State Mut. Life Assur. Co.*, 605 F.2d 75, 79 (3d Cir. 1979). "If the non-moving party presents us with a reasonable reading of the contract ... then a question of fact as to the meaning of the contract exists...." *Id.* If a contract is ambiguous, summary judgment is not appropriate. "A contract is ambiguous if it is susceptible of more than one meaning." *Mellon Bank v. Aetna,* 619 F.2d 1001, 1011 (3d Cir.1980).

The Court finds that the Standard Provisions are not ambiguous, and that Cemar's interpretation is not a reasonable reading of them. Nissan's perpetual agreement with Cemar expressly reserved to Nissan the power to approve or disapprove the relocation of the Rising Sun dealership.

This power necessarily implies a power to impose conditions on granting such approval. The sentence in § 2(C) cited by Cemar cannot be read to restrict that power. Logically, in fact, a new Facilities Addendum could be executed only *after* a dealer and Nissan came to terms on a relocation, because the Facilities Addendum was to "reflect" any changes "agreed to". *Standard Provisions* § 2(C).[8]

The Court therefore concludes that, as a matter of law, the perpetual agreement did not restrict Nissan's power to require that the Rising Sun dealership be terminated as a condition of approving the relocation to Perryville.

### B. Allocation of Vehicles.

■ Cemar alleges that Nissan failed to allocate to Cemar's dealerships the proper number and mix of vehicles, as required by the dealership agreements. Under those agreements, Nissan's Equitable Distribution System ("EDS") dictated the distribution of vehicles. The EDS provided a somewhat complex formula for calculating how many of each Nissan model were to be distributed to each dealer each month, based on periodic marketing data and other information. *See Nissan App.* at 62.

Cemar claims, first, that a large part of its inventory of automobiles consisted of Nissan models that were not salable in the geographic area that Cemar served, and that many of the vehicles offered to Cemar were vehicles that had already been offered to, and rejected by, other dealers. However, Cemar fails to identify any provision of the EDS formula or of the dealership agreements that required Nissan to supply Cemar with vehicles that Cemar considered salable, or prohibited Nissan

---

**8.** Furthermore, while it is true that § 2(C) provided for the execution of a new Facilities Addendum when a dealership relocated, and there is no evidence that Nissan executed such a document, § 2(C) cannot be read to require that in every case of dealer relocation, a new Facilities Addendum *must* be executed. According to Section 2(B), a Facilities Addendum is simply a description of the facilities a dealer has agreed to provide and maintain. Thus, if a dealer were to relocate under his existing dealership agreement, his original Facilities Addendum would become inaccurate, and a new one would have to be executed, as provided in § 2(C). However, if a dealer relocates by terminating an old dealership agreement and executing a new one, the new agreement will presumably contain an accurate description of the new facilities, thus making the execution of a new Facilities Addendum redundant.

from offering Cemar vehicles that had been rejected by other dealers.

Nor does Cemar appear to claim that Nissan failed to follow the EDS formula in making its allocations to Cemar. Elsewhere in its Memorandum, Cemar cites a graph showing Perryville's inventory, allocations, and sales as evidence that Nissan has refused to "fulfill its obligations to Cemar." *See Cemar Mem.* at 54. However, as discussed in Part IV of this Opinion, Cemar has offered no explanation of how the figures on the graph lend any support either to the claim that Nissan had certain "obligations" to Cemar, or to the claim that Nissan did not fulfill those alleged "obligations."

In sum, Cemar fails to identify *any* particular provision of the EDS or the dealership agreements that it claims Nissan breached in making Cemar's vehicle allocations. Because Cemar has failed to raise a genuine issue of material fact as to either of its breach of contract allegations, Nissan's motion for summary judgment on Count XII will be granted.

## VIII. REFUSAL TO DELIVER ADVERTISED VEHICLES (Count VII).

Cemar alleges that Nissan violated Md.Trans.Code Ann. § 15–208 by refusing to deliver vehicles to Cemar after Nissan had advertised those vehicles as being available for immediate delivery, and after Cemar had submitted orders for those vehicles to Nissan.

The statute provides, in pertinent part: Manufacturers.—A manufacturer may not refuse to deliver new motor vehicles ... to a licensed dealer, in reasonable quantities and within a reasonable time after receipt of a written order, if:

    (1) The manufacturer specifically advertises that these vehicles are available for immediate delivery, and

    (2) The dealer has a franchise or other contract with the manufacturer for the sale of these vehicles to the public.

Md.Trans.Cd.Ann. § 15–208(a).

In support of its claim, Cemar argues that when Alvin Walton told Murray, "I'll get you cars," *see Murray Dep., Cemar App.* at 31, 33, Walton was, in effect, "advertising" that extra cars, in addition to the regular allocations to which Cemar was entitled, would be available to Cemar. During August, Murray sent to Nissan special orders for a number of automobiles. *Murray Dep. Exhibits 40–48, Cemar App.* at 164–72. However, Nissan never delivered any of those automobiles to Cemar.

The provision of the Maryland Transportation Code in question here prohibits a manufacturer from refusing to deliver vehicles to a dealer only if the manufacturer "specifically advertises" that the vehicles are available for "immediate delivery." Cemar suggests that Walton's statement satisfies this requirement. *Cemar Mem.* at 50. Cemar offers no other evidence of any "advertising," but urges the court not to "narrowly construe" the term "advertising" to mean only written representations.

Even if Walton's statement had been written, however, it would not have been "advertising" within the meaning of the statute, because it was directed to Murray, not to the general public. There is therefore no merit to plaintiff's suggested interpretation of the statute. Furthermore, Walton's statement cannot be taken to mean that certain vehicles were available for immediate delivery. Absent evidence that Nissan specifically advertised any vehicles as being available for immediate delivery, there can be no violation of the statute. Defendant's motion for summary judgment will be granted as to Count VII.

## IX. CONCLUSION.

For the foregoing reasons, Nissan's motion for summary judgment will be granted as to all pending claims in this action. The Court will enter an order in accordance with this Opinion.