**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

U.S. FOODSERVICE, INC.,

        *Plaintiff-Appellee,*

    v.

TRUCK DRIVERS & HELPERS LOCAL
UNION NO. 355 HEALTH &
WELFARE FUND,

        *Defendant-Appellant,*

    and

TRUCK DRIVERS & HELPERS LOCAL
355 RETIREMENT PENSION PLAN;
TRUSTEES OF THE TRUCK DRIVERS &
HELPERS LOCAL UNION NO. 355
RETIREMENT PENSION PLAN;
TRUSTEES OF THE TRUCK DRIVERS &
HELPERS LOCAL UNION NO. 355
HEALTH AND WELFARE FUND;
BENEFITS ADMINISTRATION
CORPORATION, INC.,

        *Defendants.*

No. 12-1108

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, Senior District Judge.
(1:09-cv-00266-JFM)

Argued: October 23, 2012

Decided: November 30, 2012

Before WILKINSON, KEENAN, and DIAZ, Circuit Judges.

---

Reversed and remanded by published opinion. Judge Wilkinson wrote the opinion, in which Judge Keenan and Judge Diaz joined.

---

### COUNSEL

**ARGUED:** Paul Douglas Starr, ABATO, RUBENSTEIN & ABATO, PA, Baltimore, Maryland, for Appellant. Stefan Jan Marculewicz, LITTLER MENDELSON PC, Washington, D.C., for Appellee. **ON BRIEF:** Corey S. Bott, Meghan Horn, ABATO, RUBENSTEIN & ABATO, PA, Baltimore, Maryland, for Appellant. Steven E. Kaplan, LITTLER MENDELSON PC, Washington, D.C., for Appellee.

---

### OPINION

WILKINSON, Circuit Judge:

The Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, provides that assets of an ERISA plan "shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1103(c)(1). As an exception to this general rule, the statute permits the return of an employer's plan contribution that was the result of "a mistake of fact or law," but only "after the plan administrator determines that the contribution was made by such a mistake." *Id.* § 1103(c)(2)(A)(ii). Here, the district court ordered return of certain allegedly mistaken employer contributions even though the plan administrator determined

that the contributions were not made by mistake. Because we find that the administrator's decision was not an abuse of discretion, we must reverse the judgment of the district court and remand for further proceedings consistent with this decision.

I.

A.

Teamsters Local Union No. 355 ("Local 355") is a labor organization representing workers in various industries in parts of Maryland, Delaware, and Virginia. Local 355 is currently party to collective bargaining agreements ("CBAs") with approximately seventy-five employers, including appellee U.S. Foodservice ("USF"). Pursuant to its CBA with Local 355, USF makes contributions on behalf of its employees to appellant Truck Drivers and Helpers Local Union No. 355 Health and Welfare Fund (the "Health Fund"), an ERISA multiemployer welfare benefit plan. Since 1957, USF or its predecessor companies have been party to various CBAs with Local 355. Each CBA has required USF to contribute a certain amount to the Health Fund based on the number of hours worked by USF employees.

The Health Fund was established in 1957 and is governed by a board of trustees pursuant to a trust agreement. Local 355 has also established an associated pension fund (the "Pension Fund"). As permitted by ERISA, the trustees of both funds have designated a third-party administrator, Benefits Administration Corporation ("BAC"), to oversee their day-to-day operations. BAC serves at the pleasure of the trustees, who are ultimately responsible for any decisions made on behalf of the Funds. Section 9.5 of the Health Fund's trust agreement contemplates the possibility of mistaken employer contributions and provides BAC and the trustees with the following directive: "In no event shall any Employer, directly or indirectly, receive any refund on contributions made by them to

the Trust (except in case of a mistake, to the extent permitted by law)."

At issue in this appeal are contributions made pursuant to Article 20, Section 3 of USF's CBA with Local 355, which states:

> The Company, as of [date], agrees to pay into the Fund, [amount] for each straight time hour or fraction thereof paid to each employee covered by this Agreement or by subsequent collective bargaining Agreements between the parties hereto up to but not in excess of fifty (50) straight time hours in any one (1) work week in the case of each employee.

Similar language has appeared in every CBA between USF and Local 355 since the two parties entered into their first CBA in 1957. Only the effective date and dollar amount to be paid have changed. It is undisputed that from at least 1988 through early 2008, USF consistently paid the specified contribution amount for each hour worked up to fifty hours per week per employee, even though each employee's forty-first through fiftieth hours were generally paid at an overtime rate.

In March 2008, following the replacement of a long-time payroll clerk, USF discovered that it may have been contributing more to the Funds than was required by the governing CBA. USF subsequently completed an internal audit and concluded that it had mistakenly contributed too much to both the Health Fund and the Pension Fund for the period from January 2006 through March 2008. As relevant to this appeal, USF determined that it had made contributions to the Health Fund for hours paid at the overtime rate even though USF believed the governing CBA only required contributions for hours paid at the straight-time rate. USF halted the allegedly mistaken contributions in March 2008 and has not resumed those contributions to date.

On September 26, 2008, USF notified the Funds of the alleged overpayments and requested a refund of the relevant amounts. With respect to the contributions in dispute here, USF argued that it made payments to the Health Fund for hours paid at the overtime rate even though the governing CBA required contributions only "for each straight time hour or fraction thereof." USF interpreted "straight time hour" to include only hours paid at the straight-time rate, not hours paid at the overtime rate.

On January 5, 2009, the Funds, acting through counsel, responded to USF and formally "determined that no overpayments were made, and that [USF] has correctly paid employee benefit contributions for its employees in accordance with the [CBA] to which it is signatory." The "straight time" modifier, the Funds stated, indicates that contributions for each employee's first fifty hours of work each week "are owed at the applicable contribution rate" and not at any premium contribution rate "regardless of the rate of pay earned by the company's employee for the particular hour." The Funds further explained:

> To interpret the CBA as limiting contributions to the Health Fund for hours worked by employees to forty (40) hours per week because U.S. Foodservice was paying its employees time and one half for hours in excess of forty (40) per week is contrary to the terms of the CBA which requires contributions on up to fifty (50) hours [per week].

The Funds thus declined to return any of the requested contributions.

## B.

On February 5, 2009, USF filed suit in the District of Maryland against, *inter alia*, the Health Fund and the Pension Fund, seeking recovery of allegedly mistaken contributions

for the period from January 2006 through March 2008. USF brought its claims under both ERISA Section 403 and the federal common law of unjust enrichment. The main issue in dispute was whether contributions for overtime hours were required by the CBA.

The district court granted USF's motion for summary judgment and denied the Funds' cross-motion. The court held that the CBA language "is clear and unambiguous": "straight time" is "time that does not include overtime or premiums." J.A. 1245. Therefore, "as written in the CBA, 'straight time' modifies the word 'hour' such that contributions are required only for the 'straight time hours' the employee is paid, and not for overtime hours." *Id.* The district court rejected the Funds' alternative construction as "untenable" and declined to consider extrinsic evidence because it found the CBA language to be unambiguous. J.A. 1246.

USF moved for summary judgment on the amount of restitution and proffered evidence indicating that the Health Fund owed it $858,135.35 for mistaken overtime-related payments during the period from January 1, 2006, through March 31, 2008. The district court again granted USF's motion for summary judgment, setting the restitution figure at $858,135.35. J.A. 1385. The court entered final judgment in the case, and the Health Fund timely noted this appeal.

II.

ERISA is "a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans," *Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 90 (1983), and it provides a clear framework for our analysis in this case. We thus begin with a discussion of how the statute treats the circumstances under which an employer may obtain a refund of mistaken plan contributions.

As discussed above, ERISA Section 403(c)(1), also known as the "anti-inurement provision," *e.g.*, *Chao v. Malkani*, 452

F.3d 290, 297 (4th Cir. 2006), provides that "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1103(c)(1). Congress intended for the provision "to establish uniform fiduciary standards to prevent transactions which dissipate or endanger plan assets." 120 Cong. Rec. 29,932 (1974). The Supreme Court has emphasized that section 403(c)(1) was crafted "to discourage abuses such as self-dealing, imprudent investment, and misappropriation of plan assets, by employers and others." *Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1, 23 (2004). In short, section 403(c)(1) exists to protect plan assets and ensure that they benefit the participating employees for whom, after all, the plans were established.

But the anti-inurement provision does not transform every ERISA plan into a lockbox from which mistaken contributions may never be sprung free. Section 403(c)(2) provides that if a contribution or payment "is made by an employer to a multiemployer plan by a mistake of fact or law," section 403(c)(1) "shall not prohibit the return of such contribution or payment to the employer within 6 months after the plan administrator determines that the contribution was made by such a mistake." 29 U.S.C. § 1103(c)(2)(A)(ii).

The import of these provisions is apparent. They vest the plan administrator with broad discretion in determining when a refund is appropriate: *if* the administrator "determines that the contribution was made by . . . mistake," *then* the anti-inurement provision "*shall not prohibit* the return of such contribution." The statute is clear that the administrator is to decide in the first instance whether a particular contribution was made by mistake. If the administrator does determine that a contribution was mistaken, the administrator may then decide whether to return the payment. By its terms, the statute neither prohibits nor requires return of a mistaken contribu-

tion, leaving the decision in the first instance to the sound discretion of the plan administrator.

Congress was faced with two potential problems when it considered how to deal with mistaken ERISA contributions. A recovery mechanism that was too restrictive might make employers reluctant to contribute to plans in the first place out of fear of never being able to recover in the case of an oversight. And a mechanism that was too favorable to employers might seriously undermine the financial stability of plans and leave them prey to unilateral withdrawals by an employer under the guise of a "mistake." In crafting the exception in section 403(c)(2)(A)(ii), Congress sought to strike a balance: "[R]ecognizing the inequity that may arise when employers incur costly losses for honest errors," Congress provided a mechanism through which mistaken contributions could be returned. *Malkani*, 452 F.3d at 297. But also mindful that "[u]ncertainty and instability could easily ensue from an open-ended remedy for mistaken contributions," Congress "secured peace of mind for plans and their participants" by providing the plan administrator with discretion to determine in the first instance (1) whether a given contribution was actually the result of a mistake and (2) whether a mistaken contribution should be returned to the contributing employer. *Id.*

We again note our agreement with those sister circuits that have found that an administrator's determination with respect to the requirements of section 403(c)(2)(A)(ii) is subject to review for an abuse of discretion. *See Provident Life & Accident Ins. Co. v. Waller*, 906 F.2d 985, 993 (4th Cir. 1990) (recognizing that "several courts have cited to [section 403(c)(2)(A)] in creating a common law remedy for employers in their suits to recover erroneous payments to pension funds"); *see also Frank L. Ciminelli Const. Co. v. Buffalo Laborers Supp. Unemployment Benefit Fund*, 976 F.2d 834, 835-36 (2d Cir. 1992); *Teamster's Local 348 Health & Welfare Fund v. Kohn Beverage Co.*, 749 F.2d 315, 321 (6th Cir. 1984); *Peckham v. Bd. of Trs. of Int'l Bhd. of Painters &*

*Allied Trades Union*, 719 F.2d 1063, 1066 (10th Cir. 1983). For instance, in *Kohn Beverage*, the Sixth Circuit stated that ERISA Section 403(c) "places the determination as to whether a mistaken contribution was made in the hands of the benefit plan administrator." 749 F.2d at 321. It elaborated: "The trustees' action is conclusive unless arbitrary or capricious, not supported by substantial evidence, or erroneous on a question of law." *Id.*

Narrow review of an administrator's decision accords both with the permissive language of section 403(c)(2)(A)(ii), which leaves to the administrator the initial determination of whether a given contribution was made by mistake, and with Congress's belief "that the risk of mistaken contributions should rest largely with the employer." *Ciminelli*, 976 F.2d at 836. This allocation of risk is reasonable given that funds often "cannot easily determine whether a payment is mistaken, whereas employers have readily available and accurate information concerning factors such as the number of hours each employee worked in each pay period." *Id.* Judicial review protects employers from administrators who might act arbitrarily, while the limited scope of that review protects administrators and beneficiaries from unexpected, unilateral plan withdrawals by employers. And the scheme laid out in section 403(c) is effective in practice, as suggested by the fact that, in the shadow of judicial review in this very case, the Funds agreed to return over one hundred thousand dollars for overpayments (not disputed by the parties) related to short-term disability and workers' compensation benefits.

In sum, section 403(c) is clear that it is the plan administrator — not a reviewing court — that determines in the first instance (1) whether a given contribution was made by mistake and (2) if so, whether it should be returned to the contributing employer. A court may review the administrator's determinations for an abuse of discretion, but that standard has always been synonymous with deference.

III.

As explained above, at issue in this appeal are contributions made pursuant to Article 20, Section 3 of USF's CBA with Local 355, which states:

> The Company, as of [date], agrees to pay into the Fund, [amount] for each straight time hour or fraction thereof paid to each employee covered by this Agreement or by subsequent collective bargaining Agreements between the parties hereto up to but not in excess of fifty (50) straight time hours in any one (1) work week in the case of each employee.

Virtually identical language has appeared in every collective bargaining agreement between USF and Local 355 since the two parties entered into their first CBA in 1957. The Health Fund contends that, since 1957, USF has consistently made contributions for each employee's first fifty hours worked each week, even though the forty-first through fiftieth hours were generally paid at overtime rates pursuant to other CBA provisions. USF argues that its verifiable contribution history stretches back only to the late 1980's, but it concedes that it made the allegedly mistaken payments for over twenty years.

Despite its past practices, USF now asserts that it is not obligated to make contributions for overtime hours because the CBA language requires a contribution only "for each straight time hour or fraction thereof paid to each employee." USF argues that the CBA language is unambiguous and requires USF to contribute for up to fifty hours paid at the "straight time" rate but not for any hours paid at the overtime rate. The Health Fund, on the other hand, argues that the CBA obligates USF to contribute for the first fifty hours worked by each employee each week, regardless of the rate of pay for those hours. In the Health Fund's view, the "straight time" language "was the parties' attempt to evidence that despite USF's obligation to pay employees wages at a higher rate for

hours worked over forty, it was not obligated to pay a higher contribution rate for those hours." Health Fund Br. at 21.

Again, Congress has vested in the plan administrator—not the courts—the discretion to determine in the first instance whether USF's contributions were made by mistake. By its letter of January 5, 2009, to USF's Director of Labor Relations, the Health Fund, acting through counsel, set forth its view. It expressly rejected USF's claim that the overtime contributions were the result of a mistake and concluded that the "plain language of the CBA requires employee benefit contributions on up to fifty (50) hours per week." The "straight time" modifier, the Health Fund elaborated, "indicates that contributions are owed at the applicable contribution rate regardless of the rate of pay earned by the . . . employee for the particular hour." As the Health Fund explained:

> To interpret the CBA as limiting contributions to the Health Fund for hours worked by employees to forty (40) hours per week because U.S. Foodservice was paying its employees time and one half for hours in excess of forty (40) per week is contrary to the terms of the CBA which requires contributions on up to fifty (50) hours. Such an interpretation would negate any obligation of an employer to make contributions on hours beyond forty (40) per week, and would render the plain language of the CBA meaningless. This was not the intention of the bargaining parties and is contrary to well settled tenets of contract interpretation.

Even in the face of Congress's clear instructions, USF would have us overlook the Health Fund's determination and decide *de novo* whether the disputed contributions should be returned. But, as we have stated, the text of section 403(c)(2)(A)(ii) leaves room for only a limited review of a plan administrator's decision. We need not decide whether the Health Fund's interpretation is the best one, the better one, or

the one that we would reach were we construing the contract *de novo*. Rather, we need decide only whether the Health Fund acted reasonably when it determined that the overtime contributions were not the result of a mistake. We conclude that it did.\*

Here the fact that USF's argument is plausible hardly means that the Health Fund's is not. In addition to its textual argument noted above, the Health Fund's interpretation of the disputed CBA language is reasonably supported by the parties' course of dealing. *See Transp.-Commc'n Emp. Union v. Union Pac. R.R. Co.*, 385 U.S. 157, 161 (1966). It is certainly true that evidence extrinsic to the contract itself must be handled with caution. *See Clark v. Ryan*, 818 F.2d 1102, 1105 (4th Cir. 1987). But here the course of dealing is not in dispute. From at least 1988 through March 2008, USF — in accordance with the Health Fund's interpretation of the CBA language—made contributions for up to fifty hours per week per employee, even though some of those hours were paid at an overtime rate. The language at issue here did not change across the seven CBAs that were negotiated over the two decades during which USF admittedly made overtime contributions. By USF's own calculations, the contributions amounted to a substantial sum -– approximately $400,000 per year in 2006 and 2007.

To hold that the Health Fund's determination was unreasonable would require us to infer that USF itself acted with great imprudence for at least two and perhaps as many as five decades by ignoring a clear error in the Health Fund's interpretation and by mistakenly contributing hundreds of thou-

---

\*As reasoned above, section 403(c)(2)(a)(ii) permits -– but does not require—return of contributions after the administrator has made the threshold determination that the contributions were, in fact, made by mistake. Because we hold that the Health Fund did not abuse its discretion in determining that USF's overtime contributions were *not* the result of a mistake, we do not reach the question of whether the Health Fund abused its discretion in declining to return those contributions.

sands of dollars per year for overtime hours. Such an inference is untenable, given the sophistication of the parties and their ongoing review of the CBA terms as part of periodic renegotiations. Were the Health Fund's determination patently unreasonable, as USF would have us hold, one must wonder why the alleged mistake took decades to come to light.

Moreover, the Health Fund is not alone in reading the CBA language as it does. The record indicates that at least eight employers other than USF are parties to CBAs with Local 355 that include the same "straight time" language in dispute here. All eight of these employers, including United Parcel Service, Acme Paper & Supply Co., Avis Rent-A-Car, and The Hertz Corporation, have historically contributed to the Health Fund for up to fifty hours per week per employee, even when some of those hours were paid at an overtime rate. Only one has recently changed its position and adopted USF's interpretation of the CBA language. Notwithstanding this dissenting voice, the fact that so many other large companies agree with the Health Fund's interpretation supports our conclusion that the Health Fund's determination was, at the very least, reasonable.

Finally, the trust agreement itself—incorporated by reference into each CBA—also supports the Health Fund's interpretation. Section 4.1(e) states that each employer "shall make contributions to the Trust Fund on behalf of employees for all 'hours worked' and/or all 'hours paid' as these terms may be employed in any collective bargaining agreement." Although the CBA is clear that USF need not contribute to the Health Fund for more than fifty hours per week per employee, the references to "all hours worked" and "all hours paid" reasonably support the Health Fund's conclusion that contributions are due and owing regardless of whether a particular hour was paid at the straight-time rate or the overtime rate.

## IV.

For the reasons stated above, the Health Fund's reading of the collective bargaining agreement was a reasonable one and thus by definition not an abuse of discretion. The parties are in accord that the result on USF's refund claims applies to any delinquent contributions owed by USF under the collective bargaining agreement provision discussed above. We must therefore reverse the district court's grant of summary judgment to USF both on its claims and on the Health Fund's counterclaims. We remand for such further proceedings as are required by this decision.

*REVERSED AND REMANDED*