**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 23-2202 and 24-2291
_____

BOARD OF TRUSTEES PLUMBERS AND PIPEFITTERS LOCAL UNION NO 74
PENSION FUND; BOARD OF TRUSTEES PLUMBERS AND PIPEFITTERS LOCAL
UNION NO 74 ANNUITY FUND; BOARD OF TRUSTEES PLUMBERS AND
PIPEFITTERS LOCAL UNION NO 74 WELFARE FUND; BOARD OF TRUSTEES
PLUMBERS AND PIPEFITTERS LOCAL UNION NO 74 SCHOLARSHIP FUND;
BOARD OF TRUSTEES PLUMBERS AND PIPEFITTERS LOCAL UNION NO 74
APPRENTICESHIP FUND; BOARD OF TRUSTEES PLUMBERS AND
PIPEFITTERS LOCAL UNION NO 74 EDUCATIONAL PAC FUND; UNITED
ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBERS
AND PIPEFITTERS OF THE UNITED STATES AND CANADA LOCAL 74

v.

JONES LANG LASALLE AMERICAS INC.,
Appellant
_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. Civil No. 1:20-cv-00194)
Circuit Judge: Honorable Todd M. Hughes[*]
_____

Argued: May 28, 2025

Before: KRAUSE, BIBAS, and MONTGOMERY-REEVES, *Circuit Judges*.

(Filed: September 19, 2025)

_____

[*] The Honorable Todd M. Hughes, Circuit Judge for the United States Court of Appeals
for the Federal Circuit sitting by designation pursuant to 28 U.S.C. § 291(b).

Melinda R. Hudson
Emily A. Kile-Maxwell
Brian Paul     **[ARGUED]**
Faegre Drinker Biddle & Reath
300 N Meridian Street
Suite 2500
Indianapolis, IN 46204

*Counsel for Appellant Jones Lang Lasalle Americas, Inc.*

W. Daniel Feehan, III        **[ARGUED]**
Holroyd Gelman
2005 Market Street
Suite 920
Philadelphia, PA 19103

Jennifer M. Kinkus
Timothy J. Snyder
Young Conaway Stargatt & Taylor
1000 N King Street
Rodney Square
Wilmington, DE 19801

*Counsel for Appellees Board of Trustees Plumbers and Pipefitters Local Union No 74 Pension Fund; Board of Trustees Plumbers and Pipefitters Local Union No 74 Annuity Fund; Board of Trustees Plumbers and Pipefitters Local Union No 74 Welfare Fund; Board of Trustees Plumbers and Pipefitters Local Union No 74 Scholarship Fund; Board of Trustees Plumbers and Pipefitters Local Union No 74 Apprenticeship Fund; Board of Trustees Plumbers and Pipefitters Local Union No 74 Educational Pac Fund; United Association of Journeymen and Apprentices of the Plumbers and Pipefitters of the United States and Canada Local 74*

_____

OPINION[**]

_____

MONTGOMERY-REEVES, *Circuit Judge.*

---

[**] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

In this appeal, we consider how overtime affects contributions to multiemployer plans. In particular, the parties ask us to determine whether an employer, obligated under various collective bargaining agreements to contribute to multiemployer plans for "hours paid," must increase contributions for an employee's overtime hours beyond the number of hours worked. The plain language of the collective bargaining agreements reveals that the answer here is no. Under the relevant agreements, overtime is a premium wage rate that does not bear on the amount of total "hours paid" to employees. "Hours paid," in turn, reflects the total number of hours for which an employee is compensated, regardless of rate. Thus, the phrase "hours paid" does not require increased contributions to multiemployer plans for overtime hours. As such, we will reverse the judgment of the District Court.

## I. BACKGROUND

Jones Lang LaSalle Americas, Inc. ("Jones") entered into various collective bargaining agreements ("CBAs") with Local Union No. 74 of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry (the "Union"). At issue are two sets of CBAs that obligated Jones to contribute to various multiemployer plans based on "hours paid" to employees—one set concerning employees at a Honeywell, Inc. ("Honeywell") property and another at a J.P. Morgan Chase property. The Honeywell and J.P. Morgan Chase CBAs are materially identical.[1]

---

[1] Jones assumed the terms of the first J.P. Morgan Chase CBA from a prior employer, Cushman & Wakefield.

The CBAs comprehensively address how employees are compensated for their time. Relevant to this appeal are provisions addressing overtime and holiday pay. Overtime provisions specified that "[t]ime and one-half (1-1/2) shall be paid for all hours worked over forty (40) hours." App. 2460. And an employee "scheduled to work on a holiday" would receive "double time and one half . . . for all hours worked." App. 2465. But the CBAs prohibited "pyramiding or duplicating" any "overtime or holiday premium pay" such that "hours used to compute one premium shall not be used to compute another" for the "same hours worked"; instead, "the highest shall be paid." App. 623, 2460. Aside from overtime and holiday pay, the CBAs likewise required compensation for events like bereavement leave, unworked holidays, paid time off, and jury duty.

A 2013 audit led to the present dispute. An auditor for the Union found that Jones failed to properly account for overtime when contributing to the multiemployer plans. The auditor wrote that, for example, "8hrs [overtime] would equal 12 hours" of contributions under the CBAs. App. 2473. Jones disagreed that it needed to increase multiemployer plan contributions by the overtime rate; the parties failed to resolve the issue and never raised it during the subsequent CBA negotiations; and Jones continued to contribute to the multiemployer plans in the same manner as before the 2013 audit and did not increase contributions based on overtime. Years passed, and in 2018, the same auditor concluded that Jones had underfunded the multiemployer plans by not increasing contributions for the overtime hours—the "hours paid." Jones again disagreed. Jones explained that the auditor misinterpreted what "hours paid" meant because it "dutifully reported all hours that [it] paid"; for example, when an employee "works 10 hours of

4

overtime," those hours "would have been used to calculate benefits" at the applicable rate of contribution. App. 2568.

The Union sued Jones under the Employee Retirement Income Security Act of 1974 ("ERISA"), alleging that Jones violated the terms of the CBAs by deficiently contributing to the various multiemployer plans. *See* 29 U.S.C. § 1145. The District Court determined that the CBAs were ambiguous because both parties had reasonable interpretations of the meaning of "hours paid." The District Court then examined extrinsic evidence introduced at a bench trial to determine what the parties intended when the CBAs used "hours paid" and held that the "correct definition of 'hours paid'" means that "one hour of overtime paid at time-and-a-half would constitute 1.5 hours paid." App. 52. This left Jones liable under ERISA for deficient contributions. Jones appealed.[2]

## II. DISCUSSION[3]

To determine whether the term "hours paid" requires increased contributions for overtime hours, we first analyze the language of the CBAs to determine if the language is

---

[2] Jones filed a notice of appeal before the District Court's final entry of judgment out of concern for whether we could consider the District Court's post-trial opinion as an appealable final judgment. "[A] finding of liability that does not also specify damages is not a final decision" unless all remaining issues are "purely ministerial." *Vitale v. Latrobe Area Hosp.*, 420 F.3d 278, 281 (3d Cir. 2005) (alteration in original) (quoting *Marshak v. Treadwell*, 240 F.3d 184, 190 (3d Cir. 2001)). Because the District Court's post-trial opinion did not resolve damages, which the parties disputed, we will dismiss the first appeal and exercise jurisdiction over the second that followed the District Court's final entry of judgment.

[3] The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291.

ambiguous. *See Teamsters Indus. Emps. Welfare Fund v. Rolls-Royce Motor Cars, Inc.*, 989 F.2d 132, 135 (3d Cir. 1993) ("[W]hether a contract term is clear or ambiguous is a pure question of law requiring plenary review." (citations omitted)). Then we address three alternative bases that the Union suggests require us to affirm.

### A. The Plain and Unambiguous Text of the CBAs

"[CBAs] must be interpreted 'according to ordinary principles of contract law.'" *CNH Indus. N.V. v. Reese*, 583 U.S. 133, 135 (2018) (quoting *M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015)). We assign "[t]he plain, common, or normal meaning of language . . . to the words of a contract." 11 R. Lord, Williston on Contracts § 32:3 (4th ed. 2012) (hereinafter "Williston"); *Tackett*, 574 U.S. at 435. We read contracts "as a whole and every part will be read with reference to the whole." Williston § 32:5; *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 279 (1956). When "the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent." *Tackett*, 574 U.S. at 435 (quoting Williston § 30:6)); *see also id.* (explaining that the "rule that contractual 'provisions ordinarily should be enforced as written is especially appropriate when enforcing an ERISA [multiemployer] plan'" (quoting *Heimeschoff v. Hartford Life & Accident Ins. Co.*, 571 U.S. 99, 108 (2013))). And for "terms which are not defined in a

---

"On the appeal of a bench trial, we review a district court's findings of fact for clear error and its conclusions of law de novo." *McCutcheon v. Am.'s Servicing Co.*, 560 F.3d 143, 147 (3d Cir. 2009) (italics omitted) (citing *Am. Soc'y for Testing & Materials v. Corrpro Cos.*, 478 F.3d 557, 566 (3d Cir. 2007)).

contract," we determine their plain, common, or normal meaning by looking "to [contemporaneous] dictionaries for assistance." *Lorillard Tobacco Co. v. Am. Legacy. Found.*, 903 A.2d 728, 738 (Del. 2006). But dictionaries do not operate as straitjackets, and at times a special meaning may attach to a contractual term. Williston § 32:3. For example, "known customs or usages in a particular industry" can vary the "meaning of a contract." *Tackett*, 574 U.S. at 439. After conducting this analysis, we will find that an ambiguity exists only when, despite our attempt at interpretation, a contract term "remains reasonably susceptible to at least two reasonable but conflicting meanings." *Reese*, 583 U.S. at 139 (quotation omitted).

All agree that contributing to the multiemployer plans based on "hours paid" required Jones to contribute to multiemployer plans based on how many hours it paid employees. The question before us turns on whether the overtime rate affects the number of "hours paid." Jones argues that overtime is simply a premium rate of pay; it does not multiply or otherwise inflate the number of "hours paid" to employees. The Union counters that the phrase is at least ambiguous because overtime requires paying an employee one-and-a-half times the hours worked, meaning that employees are "paid" more "hours."

We disagree with the Union. The CBAs establish that overtime is a rate of pay that differs from the number of hours for which an employee is compensated. Consider how the CBAs described overtime and holiday pay. Employees received "double time and one half (2 ½) for all hours worked" on a scheduled holiday, App. 2465, and overtime required paying employees at time and a half for "all hours worked over forty,"

7

App. 2460.  Importantly, to avoid a situation where one hour worked might qualify for both overtime and holiday pay, the CBAs included a pyramiding provision explaining that "one premium" could be used for "overtime or holiday premium pay."  *Id.*  That is, for the "same hours worked," only the "highest [premium] shall be paid."  *Id.*

These descriptions provide invaluable insight.  The CBAs used the term "premium" to describe overtime pay, and contemporaneous dictionary definitions show that a "premium" affects an employee's wage, not the number of hours for which an employee is compensated.  *See Premium*, Black's Law Dictionary (10th ed. 2014) ("A sum of money paid in addition to a regular price, salary, or other amount; a supplemental amount of money above the normal or standard rate."); *accord Premium*, Oxford English Dictionary (3d ed. rev. 2007) (explaining that premium refers to any "wages" that are "paid above the usual or nominal price").  The CBAs likewise describe how employees "shall be paid" at "[t]ime and one-half," and the phrase time and a half is "[a] rate of pay 1.5 times the normal wage or salary, as for overtime or holiday work."  *Time and a Half*, Black's Law Dictionary (10th ed. 2014); *Time*, Oxford English Dictionary (3d ed. rev. 2012) ("Used in expressions indicating the multiple of the usual rate of pay that is to be paid in particular circumstances (most commonly for overtime), as time and a half, time and a quarter, etc."); *see also Overtime*, Black's Law Dictionary (10th ed. 2014) ("The extra wages paid for excess hours worked.").  The dictionary definitions of "overtime" and "premium" confirm that, under the ordinary meaning of both terms, the variable changed by overtime was the applicable wage rate, not the number of hours paid to employees.

8

The Union does not offer any alternative definitions, despite our request for them to do so at oral argument. Instead, the Union argues that its reading of the CBAs is reasonable because the CBAs use the terms "hours worked" and "hours paid," and its interpretation distinguishes the two by construing "hours paid" as a multiplier to whatever wage rate applies to "hours worked." Said otherwise, because the Union's interpretation would count ten hours of overtime as ten "hours worked" but fifteen "hours paid," only the Union's interpretation gives independent meaning to the phrases "hours worked" and "hours paid."

The Union's interpretation is unreasonable because it looks past the reason why the CBAs use both "hours paid" and "hours worked"—to require Jones to contribute to the multiemployer plans for unworked but compensated time, not to account for hours with a premium wage rate. Recall that the CBAs compensated employees for unworked time; for example, when employees were "not scheduled to work on . . . holidays," they had to "be paid [their] regular pay." App. 2464. Another example is bereavement leave. The CBAs required Jones to ensure "three paid bereavement days" were provided for employees when they experienced "a death in the immediate family." App. 2465. And because Jones compensated employees for that time, "hours [were] paid" and thus the CBAs required Jones to contribute to the multiemployer plans even though "hours [were not] worked." In this situation, "hours paid" does not work as a "multiplier" because there is nothing to multiply; "hours paid" simply denotes unworked-but-compensated time. But if "hours paid" does not work as a multiplier in these provisions, it should not be read as a multiplier with respect to overtime pay. *See* Williston § 32:6 ("Generally, a

9

word used by the parties in one sense will be given the same meaning throughout the contract in the absence of countervailing reasons."); *Engelhard Corp. v. NLRB*, 437 F.3d 374, 381 (3d Cir. 2006) (explaining that we do not read contract terms in isolation). As a result, while one hour of overtime counts as both an "hour worked" and "hour paid," the Union reads these terms in a vacuum without giving weight to the agreements in full.[4]

The Union offers one more argument. Citing "an axiom in the jurisprudence of workers compensation that 'pain is an excellent source of injury,'" the Union contends that the parties' "disagreement is an excellent symptom of ambiguity, provided a proffered interpretation does not blink reality." Answering Br. 7 (quotation omitted). Not so. "The mere fact that the parties do not agree on the proper construction does not make a contract ambiguous." *Pac. Emps. Ins. Co. v. Glob. Reinsurance Corp. of Am.*, 693 F.3d 417, 426 (3d Cir. 2012). Despite the Union's well-intentioned argument, our review of the CBAs shows that only one reasonable interpretation exists. *Einhorn*, 258 F.3d at 194. Because our plenary review establishes that the CBAs use the term "hours paid" to denote all compensated hours, not to overcontribute for overtime hours based on the rate of pay employees receive, the clear and unambiguous text resolves this case against the Union.

---

[4] Our dissenting colleague argues that we wrongly rely on "the definitions of 'overtime' and 'premium' rates of pay" instead of the term "hours paid." Dissenting Op. at 1. The dispute before us, however, turns on how overtime (a premium rate of pay) impacts the phrase "hours paid" under the CBAs. Thus, we must examine how the terms work together. *See supra* p.7 (explaining that we must read CBAs as a whole).

## B. The Union's Alternative Bases for Jones's Liability

The Union makes alternative arguments supporting its position. Each fails to persuade.

First, the Union urges us to look to the District Court's findings of fact about the parties' intentions to show that an ambiguity exists. The Union explained at oral argument that because "the intention of the parties is always relevant," courts "rightfully . . . kick the can down the road" by denying summary judgment in CBA cases "because all the other party has to say is . . . no, that's not really what we agreed to." Oral Arg. Tr. 24:22–23, 27:13–17. Thus, all the evidence presented at trial itself renders the CBAs ambiguous, and from there we must respect the District Court's findings of fact as to the parties' intent.

We reject this argument because it conflicts with our precedent. It is true that "traditional rules of contract interpretation apply when not inconsistent with federal labor law" and "the existence or absence of ambiguity" can be determined by looking to "the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning." *Rolls-Royce*, 989 F.2d at 135. But because we enforce CBAs by their terms when they are clear and unambiguous, extrinsic evidence used for purposes of interpreting a CBA "may *not* be used to create an ambiguity where none exists." *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Skinner Engine Co.*, 188 F.3d 130, 145 (3d Cir. 1999). Instead, we consider extrinsic evidence to "discover what the contracting parties . . . intended [a] clause to mean," *Rolls-Royce*, 989 F.2d at 136 (citation omitted), only when there is

11

"contractual language on which to hang the label of ambiguous or some yawning void that cries out for an implied term," *Skinner Engine Co.*, 188 F.3d at 146 (quoting *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 608 (7th Cir. 1993) (Posner, J.) (internal punctuation omitted)). Because no such ambiguity or yawning void exists, for the reasons we explain above, extrinsic evidence does not bear on the question before us.[5]

Second, the Union asks us to affirm based on the District Court's finding that Jones assumed a prior employer's J.P. Morgan Chase CBA and therefore assumed the employer's interpretation of it too. The prior employer, Cushman & Wakefield, increased multiemployer plan contributions when employees worked overtime, so the Union contends that Jones was "obligated to make contributions in the same manner." Answering Br. 22. But Jones made clear that it was "honor[ing]" the "provisions" of the

---

[5] To be sure, as explained above, "known customs or usages in a particular industry" can vary the "meaning of a contract." *Tackett*, 574 U.S. at 439. But the Union did not "proffer any evidence to show that there's other CBAs that interpret it [their] way." Oral Arg. Tr. 23:4–6. Instead, the Union asks us to consider evidence from "the people that were on the ground." Oral Arg. Tr. 26:20–21. But such evidence concerns only subjective evidence about what the parties intended, as the Union does not suggest that any of its witnesses testified to an industry practice regarding "hours paid." And because we consider evidence about intent only once a finding of ambiguity exists, the evidence adduced at the bench trial cannot usurp the unambiguous text of the CBAs. *Skinner Engine Co.*, 188 F.3d at 145.

We note that the only evidence of other CBAs dealing with this issue before the District Court was evidence introduced by Jones. That evidence established that when parties required heightened contributions for overtime hours based on hours paid, the CBAs spelled out how that would occur. *See, e.g.*, App. 2202 ("In the event an employee is paid at the premium time of time and one-half (1 1/2) the regular hourly rate, or double time (2x) the regular hourly rate, the aforementioned contribution rate shall be likewise increased to time and one-half (1 1/2), or double time (2x)[.]").

12

Cushman & Wakefield CBA while not following any "unwritten past practices." App. 2532–33. And the District Court itself found that Jones "assumed the terms" of the Cushman & Wakefield CBA. App. 50. It therefore cannot follow that Cushman & Wakefield's prior contributions bind Jones given that Jones disclaimed unwritten past practices and correctly contributed in accordance with the plain terms of the CBA it assumed, which did not require extra contributions for overtime.

Third and finally, the Union points to the District Court's finding that Jones intended to be bound by the Union's interpretation of "hours paid" because Jones had knowledge about the Union's view. The District Court reasoned that because Jones was aware since 2013 of the Union's interpretation upon receipt of the Union's auditor's report, it was bound by the auditor's interpretation.[6] It is true that "[a] party who willingly and *without protest* enters into a contract with knowledge of the other party's interpretation of it is bound by such interpretation," but the evidence here demonstrates that principle of contract law is inapplicable. *Emor, Inc. v. Cyprus Mines Corp.*, 467 F.2d 770, 775 (3d Cir. 1972) (quotation omitted) (emphasis added). Undisputed record evidence shows that Jones objected to the auditor's 2013 opinion and again to the auditor's 2018 conclusion.

The District Court, to its credit, did not ignore the record evidence about Jones's objections. Instead, the District Court concluded that such evidence was irrelevant

---

[6] The District Court first based this finding on the fact that Jones should have known about Cushman & Wakefield's overtime contributions after conducting due diligence, but we explain above that Jones simply assumed the terms of Cushman & Wakefield's CBA.

because Jones never explained why "hours paid" included "hours worked" but also events like "bereavement[] and paid time off." App. 49–50. It is unclear to us why Jones needed to explain in precise detail the contours of its interpretation of the difference between those terms when the record evidence shows that it objected to the Union's interpretation of the CBAs, advised the Union that it did not believe the CBAs required more contributions based on "hours paid" for overtime, and never contributed more for overtime. Because the record establishes that the District Court's finding relied on inapplicable law and inapposite facts, we are left with a "definite and firm conviction that a mistake has been committed" and thus hold that the District Court committed reversible error by binding Jones to the Union's interpretation of the CBAs. *United States v. Ashe*, 130 F.4th 50, 54 (3d Cir. 2025) (quoting *United States v. Montalvo-Flores*, 81 F.4th 339, 342 (3d Cir. 2023)).

*     *     *     *     *

Jones promised to contribute to multiemployer plans. A series of CBAs obligated it to contribute to these funds based on "hours paid" to employees. The Union argues that Jones should have increased the number of "hours paid" when employees worked overtime proportionate to their overtime rate. We reject that view as inconsistent with the CBAs. The CBAs establish that overtime increases an employee's applicable wage

14

rate but does not change the number of "hours paid." We will therefore reverse the District Court's judgment in the Union's favor.[7]

## III. CONCLUSION

For the reasons discussed above, we will reverse the judgment of the District Court.

---

[7] Because we reverse as to liability, we leave for another day questions relating to determining pre- and post-judgment interest under ERISA.

KRAUSE, *Circuit Judge*, dissenting.

If our inquiry begins and ends with the plain and unambiguous meaning of the text, we ought to consider the right text. The majority recognizes that the disputed language in the Honeywell and J.P. Morgan Chase CBAs is "hours paid," yet its analysis focuses on the definitions of "overtime" and "premium" rates of pay. The parties do not dispute that, under certain circumstances, the CBAs permit employers to compensate their employees at a different rate of pay for the same one-hour period. Rather, they dispute whether the number of "hours paid" refers to (1) the number of hours for which an employee has received any compensation at all for purposes of correlative benefits contributions—regardless of the applicable rate of pay—as Jones suggests, or (2) the number of hours for which an employee has been compensated corresponding to her hourly base rate of pay—regardless of the number of hours actually worked—as the Union suggests. Put differently, Jones contends "hours paid" means the hours that the employee actually worked or had paid leave, while the Union says it means the hours for which an employee is credited as having worked or had paid leave. As even this exposition of the dispute makes clear, "hours paid" is itself an ambiguous term, and

1

establishing the ordinary meanings of "overtime" and "premium" does not render the separate term—"hours paid"—unambiguous.[1]

Below I address the interpretation of "hours paid" before turning to the District Court's rulings on pre- and post-judgment interest.

## A. The District Court's Finding that "Hours Paid" Is Ambiguous Is Not Clearly Erroneous.

Whether a collective bargaining agreement is ambiguous is a question of law that we review *de novo* and in the same manner as other contracts. *See Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., U.A.W. v. Mack Trucks, Inc.*, 917 F.2d 107, 111 (3d Cir. 1990); *see also CNH Indus. N.V. v. Reese*, 583 U.S. 133, 135 (2018) ("[CBAs] must be interpreted 'according to ordinary principles of contract law.'" (quoting *M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015)). A contract is legally ambiguous if it is "capable of being understood in more senses than one," *Am. Flint Glass Workers Union, AFL-CIO v. Beaumont Glass Co.*, 62 F.3d 574, 581 (3d Cir. 1995) (quoting *Landtect Corp. v. State Mut. Life Assurance*, 605 F.2d 75, 80 (3d Cir.1979)). So "[b]efore it can be said that no ambiguity exists, it must be concluded that the questioned words or language are capable of [only] one interpretation." *Id.* (quoting

---

[1] The majority responds that "[t]he dispute before us . . . turns on how overtime (a premium rate of pay) impacts the phrase 'hours paid' under the CBAs," so "we must examine how the terms ['overtime,' 'premium,' and 'hours paid'] work together." Maj. Op., at 10 n. 4. But that puts the cart before the horse. The impact of "overtime" and "premium" is relevant only if "hours paid" refers to the number of hours for which an employee has received any compensation instead of the number of hours for which the employee has been compensated corresponding to her base rate of pay—the very question we are tasked with answering in this case.

2

*Landtect Corp.*, 605 F.2d at 80) (second alteration in original); *accord Mack Trucks*, 917 F.2d at 112 (concluding district court did not err by finding CBA term ambiguous because there was "nothing to suggest that this term is capable of *only one meaning*" (emphasis added)); *Inter Med. Supplies Ltd. v. EBI Med. Sys., Inc.*, 181 F.3d 446, 457 (3d Cir. 1999) (concluding district court did not err by finding contract term unambiguous because "only one of [the proffered] interpretations was reasonable").

Importantly, when determining the threshold question of legal ambiguity, our duty is not to determine the *best* reading of the relevant language, but rather to determine whether the contract "can reasonably be interpreted in two different ways." *Am. Flint Glass Workers Union*, 62 F.3d at 581. Rather than resolving ambiguity—as we do when, for instance, asked to authoritatively interpret a statute—our only job at this juncture is to identify whether "hours paid" is ambiguous. And our cases demonstrate that our threshold to find a contract term ambiguous is not particularly high. *See, e.g.*, *Teamsters Indus. Emps. Welfare Fund v. Rolls-Royce Motor Cars, Inc.*, 989 F.2d 132, 135–36 (3d Cir. 1993) (finding "each employee" ambiguous despite strong indications that the term did not include probationary employees).

To discern ambiguity, we "do not simply determine whether, from our point of view, the language [of a CBA] is clear." *Id.* at 135; *see also Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1011 (3d Cir. 1980) (rejecting a strict "four corners" approach to contract interpretation). Instead, we must consider "the proffer of the parties and determine if there [are] objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings."

3

*Rolls-Royce*, 989 F.2d at 135 (quoting *Sheet Metal Workers, Local 19 v. 2300 Grp., Inc.*, 949 F.2d 1274, 1284 (3d Cir. 1991)). Such indicia may be found in "the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation." *Id.* And although "[e]xtrinsic evidence . . . may not be used to create an ambiguity where none exists," *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., U.A.W. v. Skinner Engine Co.*, 188 F.3d 130, 145 (3d Cir. 1999), we cannot ignore such evidence where ambiguity does exist.

I agree with the majority that Jones's interpretation of "hours paid" is reasonable, but the majority ignores the Union's evidence supporting another reasonable interpretation of the term. The Union contends "hours paid" refers to the fictional number of hours for which an employee is compensated, which is calculated by multiplying the actual number of hours for which an employee is compensated by the applicable rate of pay for each hour. Answering Brief, at 10-11. It offered evidence that parties to other CBAs indulge this fiction that an hour of overtime work is ostensibly more than one hour of work, compensated at the base pay rate, thereby showing that the Union's interpretation of "hours paid" corresponds with industry practice, *see* Answering Brief, at 8-12. That evidence included documents showing that Jones's predecessor—Cushman & Wakefield—indulged this fiction by increasing plan contributions when employees worked overtime. Various provisions in the Honeywell and J.P. Morgan Chase CBAs also support the Union's interpretation by using temporal descriptors—e.g., "[t]ime and one-half (1-1/2) shall be paid," App. 606, 622—to suggest that overtime and other forms of premium pay are based on an artificial adjustment of hours worked. *See*

4

*Rolls-Royce*, 989 F.2d at 135 (recognizing that "the contract language" can provide indicia of multiple reasonable meanings of a disputed term).

To the extent the majority relies on *Reese* to suggest that that we cannot find ambiguity before making an independent "attempt at interpretation," Maj. Op., at 7, it is mistaken. The Supreme Court in *Reese* stated that "a contract is not ambiguous unless, after applying established rules of interpretation, [it] remains reasonably susceptible to at least two reasonable but conflicting meanings." 583 U.S. at 139 (quotation omitted). But this language sought to clarify that *parties* must apply *established* rules of interpretation before courts can find ambiguity based on their proffers. *Id.* (explaining that "*Yard-Man* inferences" are not established rules of interpretation, so the class of retirees cannot use them to create a second reasonable meaning of disputed language). Here, the Union's interpretation, which seeks to "give[] independent meaning to the phrases 'hours worked' and 'hours paid,'" Maj. Op., at 9, is based on a well-established principle of contract law. *See Restatement (Second) of Contracts* § 203 (1981) ("An interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect."). Therefore, *Reese* does not sanction the majority's attempt to assess which of the parties' reasonable interpretations, both generated using established rules of contract interpretation, is best.

We need not stretch our imaginations to find it plausible that a union and an employer would negotiate benefits contribution rates that increase in accordance with an employee's extra effort to work overtime. In my view, we have discounted the Union's

5

interpretation too quickly. Both parties' proposed interpretations of "hours paid" are reasonable, rendering the term ambiguous.

**B.    The District Court's Finding that the Union's Interpretation of "Hours Paid" Governed the CBAs Is Not Clearly Erroneous.**

Once a term has been found to be ambiguous, the inquiry becomes a factual one "to discover what the contracting parties . . . intended the clause to mean." *Rolls-Royce*, 989 F.2d at 136; *accord Alexander v. Primerica Holdings, Inc.*, 967 F.2d 90, 96 (3d Cir.1992).  When making this determination, the factfinder must consider "objective evidence in support of [the competing] interpretations," *Sumitomo Mach. Corp. of Am. v. AlliedSignal*, 81 F.3d 328, 335 (3d Cir. 1996) (quoting *Mellon Bank*, 619 F.2d at 1011), including "the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning." *Rolls-Royce*, 989 F.2d at 135.  This Court must credit a district court's factual findings unless they are clearly erroneous, meaning a factual determination "is completely devoid of minimum evidentiary support displaying some hue of credibility" or "bears no rational relationship to the supportive evidentiary data." *DiFederico v. Rolm Co.*, 201 F.3d 200, 208 (3d Cir. 2000) (quoting *Coalition to Save Our Children v. Bd. of Educ.*, 90 F.3d 752, 759 (3d Cir. 1996)).

Here, the District Court did not clearly err.  It considered objective evidence in support of the parties' competing interpretations, including evidence of the negotiations between Jones and the Union before entering the CBAs, as well as trial testimony and documentary evidence reflecting industry norms and the parties' understanding of "hours

6

paid." Specifically, the District Court found that Jones's predecessor—Cushman & Wakefield—treated "hours paid" according to the Union's interpretation;[2] that Jones entered into the initial J.P. Morgan Chase CBA after conducting "due diligence" and assessing Cushman & Wakefield's labor costs on an "individual employee level;" App. 29, and that Jones had reason to know the Union's interpretation of "hours paid" during the negotiation and auditing processes.

In discounting this testimony as "subjective" belief instead of evidence of industry norms, my colleagues in the majority pass over its actual content, which concerned "hours paid" in other CBAs. *See, e.g.*, App. 255, 265-66 (testifying as to whether "any employers ever argued" about the interpretation of "hours paid" in a CBA based on the witnesses eighteen years of experience in the field); App. 291-93 (explaining the contribution receipt and recording process that the witness handles for approximately forty funds). They also improperly substitute their own credibility finding for that of the District Court on this subject, which found "the [Union's] witnesses [] more credible than [Jones's] witness" and Jones's witness "not supported by any documentary evidence" and "very limited" in "professional experience." App. 40. But where, as here, the District

_____

[2] The District Court also did not err by finding that Jones assumed Cushman & Wakefield's interpretation of the CBA. Jones represented to the Union that it "intend[ed] to honor all the provisions of the [CBA] with Cushman & Wakefield, with the exception of several modifications," App. 2532-33, none of which relate to the parties' dispute over how to interpret "hours paid." Although Jones disclaimed an intent to abide by any "unwritten past practices," *id.*, an interpretation of a written contract term is not an "unwritten past practice." Therefore, it was not clear error to find that Jones expressly assumed the written terms of the Cushman & Wakefield CBA, which includes the "hours paid" term the parties dispute here.

Court's findings rest on "determinations regarding the credibility of witnesses," we must afford "even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985). The fact that the Union's witnesses' insights about industry practice were gleaned from their personal experiences working in the field does not render them subjective or discount their evidentiary value.

The District Court's conclusion is also supported by the testimony of Jones's own witnesses. *See* Jones 30(b)(6) Dep., at 18:5-21:3 (distinguishing between "hours worked" and "hours paid"); Eckardt Dep., at 17:18-18:19 (describing Jones's due diligence to understand per-employee labor costs under the prior CBA). And at least one Circuit Court has recognized the plausibility of the Union's reading of "hours paid." In that case, Judge Wilkinson, writing for a unanimous court, held that "[a]lthough the CBA is clear that [the employer] need not contribute to the Health Fund for more than fifty hours per week per employee, the references to 'all hours worked' and 'all hours paid' reasonably support the Health Fund's conclusion that [benefits] contributions are due and owing regardless of whether a particular hour was paid at the straight-time rate or the overtime rate." *U.S. Foodservice, Inc. v. Truck Drivers & Helpers Local Union no. 355 Health & Welfare Fund*, 700 F.3d 743, 751 (4th Cir. 2012).

For the foregoing reasons, we should affirm the District Court's holding as to Jones's liability—recognizing that "hours paid" is ambiguous and that the District Court's factual findings were not clearly erroneous. Because the majority instead reverses

8

the District Court's liability holding, it "leave[s] for another day questions relating to determining pre- and post-judgment interest under ERISA." Maj. Op., at 15 n.7. I will take the opportunity that this case presents to address these questions and highlight the defects in the District Court's analysis.

    **C.**    **The District Court Miscalculated Pre- and Post-Judgment Interest on Jones's Delinquent Contributions.**

After adopting the Union's interpretation of the CBAs and finding that Jones was liable for delinquent contributions, the District Court awarded the Union pre- and post-judgment interest on those delinquent contributions at an 18% interest rate. It set this rate "pursuant to the Plaintiff Funds' Collection Policy." App. 12-14. The District Court appears to follow ERISA's direction that "interest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of title 26," 29 U.S.C. § 1132(g)(2), by applying the 18% interest rate set out in the Union's Collection Policy. But the District Court fails to analyze (1) whether the Collection Policy's rate constitutes a "rate provided under [a] plan," *id.*; and (2) if so, whether that rate is permissible.

Although we have not provided much guidance as to Section 1132(g)(2), other Courts of Appeals have held that there are "two documents" that "set[] forth [ERISA] plan terms: (1) the governing plan document, *i.e.*, the trust agreement or contract under which the plan was formed; and (2) the summary plan description . . . a plain-English summary of plan benefits and obligations that the plan administrator must file with the United States Department of Labor and provide to each participant and beneficiary of the

9

plan." *Silverman v. Teamsters Local 210 Affiliated Health and Ins. Fund*, 761 F.3d 277, 286-87 (2d Cir. 2014) (footnote omitted) (citing cases from the D.C., Fifth, Seventh, and Ninth Circuits for the same proposition); *accord Marshall v. Anderson Excavating & Wrecking Co.*, 8 F.4th 700, 707 (8th Cir. 2021) ("To find the rate provided under the plan, one may look to the parties' trust agreement or the contract that formed the plan."). A CBA itself does not constitute a plan document, *see Silverman*, 761 F.3d at 287, but it may provide a basis to bind an employer to a plan document where "an employer . . . objectively manifest[s] its intent to be bound to an ERISA plan document, not merely note[s] the document's existence, or . . . acknowledge[s] that a future trust agreement will manage the operation of the fund," *32 BJ N. Pension Fund v. Nutrition Mgmt. Servs. Co.*, 935 F.3d 93, 99 (2d Cir. 2019).

Here, Jones agreed to be bound by the "reasonable" rules and regulations concerning the administration of the ERISA plans, Opening Br. 66, but contends that, for the purposes of Section 1132(g)(2), the Union's Collection Policy does not qualify as a plan document that can define the pre-judgment interest rate. The language of the CBAs indicates that the trust agreements creating the ERISA plans and the rules and regulations promulgated by the boards of trustees for those plans are distinct things. *Compare, e.g.*, App. 2457 ("(3) The Company and Union signatory to this agreement agree to be bound by and to the agreement and declaration of trust as amended from time to time, establishing each of the employees benefit funds identified in Exhibit A to the extent they are consistent with the Agreement."), *with id.* ("(5) The Company shall be bound by all reasonable rules and regulations adopted by the respective Board of Trustees in relation

10

to all trust funds identified in Exhibit A.").  The District Court failed to properly consider whether Jones agreed to be bound by a plan document setting an interest rate for purposes of Section 1132(g)(2)(B) when it assumed, without explanation, that the Collection Policy was a plan document under ERISA.  Even if the Collection Policy did constitute a plan document under Section 1132(g)(2), the District Court erred to the extent that it authorized the Union to unilaterally impose an interest rate that is not "essential to [the] management of the Funds." *Jaspan v. Glover Bottled Gas Corp.*, 80 F.3d 38, 41 (2d Cir. 1996) (rejecting the argument that a fund could unilaterally impose a liquidated damages provision on an employer for delinquent contributions).

As for post-judgment interest, the District Court abused its discretion by calculating interest at the Union's 18% rate, instead of according to the provisions of 28 U.S.C. § 1961, which governs interest "on any money judgment in a civil case recovered in a district court."  Section 1961 covers post-judgment interest on civil judgments, *see Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 102 (3d Cir. 2012), and provides that "[i]nterest shall be calculated . . . at a rate equal to the weekly average 1-year constant maturity Treasury yield."  28 U.S.C. § 1961(a).  Here, the District Court seemingly concluded that ERISA's direction that "interest on unpaid contributions shall be determined by using the rate provided under the plan," 29 U.S.C. § 1132(g)(2), extends to post-judgment interest on an award for unpaid contributions to a plan.  *See* App. 12-14.  But by its plain terms, Section 1132(g)(2) appears to speak only to pre-judgment interest—listing several components of the "award" that makes up the "judgment" for unpaid contributions. *See* 29 U.S.C. § 1132(g)(2) (listing, for example, unpaid contributions, liquidated damages

11

provided for under the plan, and attorneys' fees).  ERISA is silent on the issue of post-judgment interest, so Section 1961 should apply to a civil judgment entered under Section 1132 of ERISA.  *See* 29 U.S.C. § 1144(d) ("Nothing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States [save for two exceptions inapplicable here]."); *I.A.M Nat'l Pension Fund, Plan A, A Benefits v. Slyman Indus., Inc.*, 901 F.2d 127, 130 (D.C. Cir. 1990) (holding that § 1132(g)(2)(C) does not extend to post-judgment interest and that § 1961 provides the applicable authority for calculating post-judgment interest).  Had we reached these interest rate questions, I would have vacated the District Court's judgment and remanded for recalculation of the appropriate pre- and post-judgment interest in line with the foregoing analysis.

*       *       *

Because the majority reverses the District Court's assessment of liability—based on a flawed analysis of ambiguity—and thereby evades the pre- and post-judgment interest questions, I respectfully dissent.